# EXHIBIT 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---o0o---

COPY

ERIC ROBERT DREW,                    )
                                     )
                                     )
            Plaintiff,               )
                                     )   No.   CV 07-00726 SI
            vs.                      )
                                     )
EQUIFAX INFORMATION                  )
SERVICES, LLC, EXPERIAN              )
INFORMATION SOLUTIONS,               )
INC., et al,                         )
                                     )
            Defendant.               )
_____

DEPOSITION OF ERIC R. DREW

Thursday, November 1, 2007

Volume III
(Pages 227 to 324)

REPORTED BY:

MARIANNE McNAIR
CSR NO. 7030

LUSK & SNYDER
CERTIFIED SHORTHAND REPORTERS
3715 MONTEREY BOULEVARD
OAKLAND, CALIFORNIA 94619
(510) 482-9991

1           Okay.   This is a document that we also
2    reviewed yesterday.   I have some questions on this.
3           Can you look at page 4 of 14.
4    A.      Okay.
5    Q.      On the right-hand column.
6    A.      Yes.
7    Q.      It says, "At your request we have included
8    the following statement every time your credit
9    report is requested."
10          Is that correct?
11          Under your Personal Statement.
12   A.      Yes.   I see that.
13   Q.      At the bottom of that all caps paragraph, it
14   says, "This security alert will be maintained for
15   90 days beginning January 20, 2004."   Is that
16   correct?
17   A.      Yes.   That's what it says.
18   Q.      Now, to the best of your recollection, when
19   did you first contact the CRAs to put a fraud
20   statement on your credit report?
21   A.      I believe the first attempt at contact to the
22   CRAs was around the time, to the best of my
23   recollection, was around the time I discovered it was
24   identity theft in mid to late December.
25          I knew that, for sure, by this date,

                                                      254

1  January 21st.  I had been in contact with them because

2  there is record of it.

3  Q.      Do you have any reason to believe that a

4  fraud statement such as this appeared on any credit

5  report prior to January 20, 2004?

6  A.      Can you?

7  Q.      January 20, 2004.

8  A.      Can you repeat the question, though.

9         (Record read.)

10        THE WITNESS:  I'm unsure.  I didn't receive

11 any reports before then.

12        MR. YU:  Q.  Now, if the Fleet credit card at

13 issue here, the 4305 account, was opened prior to the

14 fraud statement being placed on your credit report,

15 Fleet would not have known about the identity theft;

16 would you agree with that statement?

17        MR. KEATING:  Objection, to the form of the

18 question, asking him to speculate on an incomplete

19 hypothetical and argumentative in form.

20        Go ahead and answer, if you are able.

21        THE WITNESS:  Fleet should have known if they

22 would have checked.

23        MR. YU:  Q.  How would they have known if they

24 would have checked?  If the fraud statement was not on

25 your credit report yet when they checked, how would

255

1  that your understanding?

2  A.        Can you repeat that.

3  Q.        Was Mr. Kotrozo just relaying what he heard

4  from the lender back to you, when he said that

5  statement?

6  A.        To the best of my knowledge.

7  Q.        Do you have any documents related to this

8  loan?

9  A.        I believe there is a statement made by

10  Mr. Kotrozo.

11  Q.        Has that been produced to your counsel?

12  A.        I believe so.  It was referenced in the

13  deposition yesterday.

14          MR. KEATING:  It's an exhibit, I believe.          .

15          MR. YU:  Q.  Do you have any documents from

16  the lender, relating to this mortgage?

17  A.        No.

18  Q.        Have you ever spoken directly to the lender

19  about this mortgage?

20  A.        No.

21  Q.        Have you ever heard -- strike that.  That's

22  fine.

23          Do you know if any documents from the lender

24  exist with regards to this mortgage?

25  A.        I don't know.

299

1    Q.        Do you know if Mr. Kotrozo has any documents
2    related to this mortgage application?
3    A.        I don't know.
4              To my recollection, I asked him for those
5    documents, and he informed me that those documents were
6    not kept for more than a short period of time.  And
7    therefore, they are no longer available.  That they had
8    been destroyed.
9    Q.        Do you have anything in writing stating that
10   Bank of America in any way affected your mortgage
11   application in June 2005?
12   A.        Yes.
13   Q.        What document is that?
14   A.        Relative credit reports from that period of
15   time.
16   Q.        Do you have anything directly linking the
17   Bank of America 4305 account to this June 2005
18   mortgage denial?
19   A.        Besides a relative timeframe on a mortgage, on
20   a reporting of that account?
21   Q.        Do you have any kind of document stating
22   that your June 2005 mortgage application was denied
23   because of Bank of America, are you aware of any
24   document that says something like that?
25   A.        I can't remember whether the documentation I

300

```
 1   Care Alliance?
 2   A.        In retrospect, honestly, no.
 3   Q.        And Seattle Cancer Care Alliance is where
 4   Richard Gibson worked at, correct?
 5   A.        That's correct.
 6   Q.        And this is where Richard Gibson stole your
 7   identity; is that correct, from -- this is where
 8   Richard Gibson stole your identity from?
 9   A.        I have reason to believe that is the case.
10   That is what he was convicted for.
11             MR. YU:  I'm almost done.  If you want to take
12   a quick break.
13             MR. KEATING:  If you need the break.
14             MR. YU:  I'll go straight ahead.
15             THE WITNESS:  I'm fine.  If we are almost
16   done, let's continue.
17             MR. YU:  Q.  How is your medical condition
18   now?
19   A.        In general, fair.
20   Q.        Have the doctors told you about, you know,
21   the nature of your health, what to expect?
22   A.        Somewhat.
23   Q.        Okay.  What did they say?
24   A.        My prognosis is unsure.  We don't have reason
25   to believe that I would relapse into leukemia, if
```

315

1    Q.        How is that document written, did you just

2    kind of dictate to him, you know, what you thought

3    should be written and then he put it in words, or

4    did you actually type something, send him a draft

5    and he revised it.

6              Do you recall the process?

7    A.        The process involved what you mentioned.

8    Q.        The former or the latter?

9    A.        Both.  Yeah, we talked back and forth.  I

10   dictated to him.  He sent me back versions.

11             This appears to be a much, you know, older

12   version that I don't think has been edited for accuracy

13   and everything else.  But.

14   Q.        Is that document periodically being updated

15   with new information?

16   A.        Not this document.  I would say there have

17   been hundreds, of, you know, documents, words,

18   articles, logs, interviews, that are transcripted.

19   This is just one version of the dictation of my story.

20   Q.        Are you still working with Credit Line

21   Financial?

22   A.        No.

23   Q.        When is the last time you worked with them?

24   A.        I believe fall of 2005, my contract expired.

25   Q.        When did you first retain them?

320

1    A.        My recollection is March of 2005. I seem to

2    recall an inquiry they made on my behalf in early April

3    of that same year.

4    Q.        Why did you retain them?

5    A.        To dispute the continuing reporting of

6    fraudulent accounts on my credit report. Fraudulent

7    inquiries. Fraudulent addresses. All of which had

8    been reported over a year prior.

9              MR. YU:  I think that's all I have, actually.

10             MR. KEATING:  Mr. Weickhardt, do you have any

11   follow-up?

12             MR. WEICKHARDT: No.

13             MR. YU:  John, if you would extend me the same

14   courtesy, if I could just maybe follow-up.

15             MR. KEATING:  To the extent Mr. Weickhardt was

16   within his time limit and shut down to leave himself

17   extra time in the two and a half hours that we

18   allocated for each defendant, I suspect you are already

19   over the two and a half hours and I don't want to be

20   harsh about that.

21             MR. WEICKHARDT:  It's like an appeal. You

22   leave time for rebuttal.

23             MR. KEATING:  He was very conscientious about

24   self-policing, so I don't know that it's appropriate.

25             MR. YU:  Can we take it up when it comes up,

                                                          321

REPORTER'S CERTIFICATE

1

2

3          I, MARIANNE McNAIR, a Certified Shorthand

4  Reporter of the State of California, hereby certify

5  that the witness in the foregoing deposition was by me

6  duly sworn to tell the truth, the whole truth and

7  nothing but the truth in the within-entitled cause;

8  that said deposition was taken at the time and place

9  therein stated; that the testimony of the said witness

10  was reported by me, a duly certified shorthand

11  reporter, and was thereafter transcribed under my

12  direction into typewriting; and that the witness was

13  given an opportunity to read and, if necessary, correct

14  said deposition and to subscribe the same.

15          I FURTHER CERTIFY that I am not of

16  counsel or attorney for either or any of the parties in

17  the foregoing deposition and caption named, or in any

18  way interested in the outcome of the cause named in

19  said caption.

20          IN WITNESS WHEREOF, I have hereunto set

21  my hand this 21st day of November, 2007.

22

23

24  MARIANNE McNAIR
    Certified Shorthand Reporter
25  Certificate No. 7030
    State of California

323

# EXHIBIT 23

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ERIC ROBERT DREW,                          )
                        Plaintiff,         )
        vs.                                )  CASE NO. CV
                                           )   07-00726 SI
EQUIFAX INFORMATION SERVICES LLC,          )
EXPERIAN INFORMATION SOLUTIONS,            )
INC., TRANSUNION LLC, NCAC, BANK           )
OF AMERICA, FLEET CREDIT CARD              )
SERVICE, AT&T UNIVERSAL CARD               )
SERVICES, CITIGROUP, BANK ONE              )
CARDMEMBER SERVICES, FIRST USA             )
BANK, N.A., and DOES 1-100,                )
and                                        )
FIA CARD SERVICES, N.A.                    )
[Previously Doe 1], CITIBANK               )
(SOUTH DAKOTA) N.A. [Previously            )
Doe 2], CHASE BANK USA, N.A.               )
[Previously Doe 3]                         )
                        Defendants.        )
_____    )


DEPOSITION OF ERIC ROBERT DREW

VOLUME IV

DATE:              January 29, 2008

TIME:              11:07 a.m.

LOCATION:          Pulone & Stromberg, Inc.
                   Certified Shorthand Reporters
                   1550 The Alameda
                   Suite 150
                   San Jose, California  95126

REPORTED BY:       Irene A. Resler
                   Certified Shorthand Reporter
                   License Number C-7685

1  loan he was submitting your application for?  Is it a

2  fixed loan?

3       A.  Can you be more specific?

4       Q.  Do you know if you were applying for a fixed

5  rate loan?

6       A.  I don't believe so.

7       Q.  Do you know if you were applying for an

8  adjustable rate mortgage?

9       A.  I believe it was.

10      Q.  Do you know what the rate was?

11      A.  No.

12      Q.  And do you know what the purchase price was on

13  that property?

14      A.  Approximately $320,000.

15      Q.  And do you know what the loan amount was that

16  you were applying for?

17      A.  100 percent loan.

18      Q.  100 percent?  And did you have to state your

19  income at the time as part of the application process?

20      A.  I believe I did.

21      Q.  What income did you state?

22      A.  I believe at that time my disability checks,

23  which was my only income, were about 1,375 monthly.

24      Q.  And do you know for what -- do you know if that

25  property sold?

98

1    A.  Yes.

2    Q.  Do you know how much it sold for?

3    A.  It was approximately the same amount. I'm not

4 sure exactly.

5    Q.  You don't know if it was more than $320,000?

6    A.  No.

7    Q.  Do you know what the address was?

8    A.  I don't remember offhand. It was on the same

9 street.

10    Q.  What street?

11    A.  Literally next door to the --

12    Q.  What street is --

13    A.  -- the other house that we still own.

14    Q.  What street is that?

15    A.  Revere Lane in Chico, California.

16    Q.  And do you know why you were denied a loan in

17 connection with that property?

18    A.  The explanation I received was mainly low

19 credit score resulting from derogatory items on your

20 credit report.

21    Q.  And who gave you that explanation?

22    A.  Fred Kotrozo.

23    Q.  And did he do that verbally?

24    A.  Yes.

25    Q.  And did he identify any specific tradelines on

123

1   asking I don't recall.

2       Q.  All right.  And if you turn to Exhibit 21.

3   Again, I don't have any detailed questions about this

4   document, but do you have it in front of you?

5       A.  Yes.

6       Q.  Okay.  And this was a letter Mr. Keating wrote

7   to Experian on your behalf.

8       A.  Um-hmm.

9       Q.  And among other things if you turn to page 88,

10  you had initialed the two inquiries from First USA on

11  that page?

12      A.  That's correct.

13      Q.  All right.  And before Mr. Keating wrote to

14  them to ask them to remove those inquiries, had you ever

15  contacted Experian yourself to say "Please remove those

16  inquiries from my credit report"?

17      A.  I believe I did.

18      Q.  And when was that?

19      A.  To the best of my recollection, sometime in

20  January, February of '04.

21      Q.  And what did you -- tell us about that call.  I

22  mean, can you be more specific about the date?

23      A.  I can't because I don't specifically remember

24  the call.

25      Q.  All right.  And did you recall what the

124

1   response was?

2        A.   No.

3        Q.   Were you looking at a particular credit report

4   at the time?

5        A.   I don't recall.

6        Q.   Hold on just a second.  I want to see if I can

7   find these inquiries on the earlier Experian credit

8   report.  And what did you say was the reason that you

9   wanted these removed?

10        A.   They weren't mine.  They were fraudulent.

11        Q.   You did understand that they reflected that

12   First USA had contacted Experian at some point about

13   your credit report; correct?

14        A.   I'm sorry.  Can you --

15        Q.   Yes.  You understand that when an inquiry is

16   listed in the name of First USA, that means that First

17   USA had contacted Experian at some point about your

18   credit; right?

19        A.   That's right.

20        Q.   And do you doubt that First USA did contact

21   Experian on the dates indicated?

22        A.   Could you give me the page number that you're

23   referencing?

24        Q.   Yeah.  That was page 88, I believe.

25        A.   Yeah, got it.

194

1    chances of a successful bone marrow transplant?

2        A.  Or to mitigate the attack of the new cells on

3    the patient.

4        Q.  Okay.  I want to ask you a few questions about

5    Greg Ursich I believe -- is that how you pronounce his

6    name?

7        A.  Yeah, Greg, Gregory Ursich.  I thought it was

8    Urchin.  I wasn't correct.

9        Q.  He helped you with your settlement with the

10   Seattle Cancer Care Alliance; is that correct?

11       A.  Yeah.  I'm not comfortable calling it a

12   settlement, but yes.

13       Q.  And that I believe -- I don't have the document

14   in front of me.  I believe that was in -- was that June

15   of 2004?

16       A.  Yeah.

17       Q.  And you -- you said earlier that you weren't

18   sure when you retained him or began to talk to him about

19   this but that it would have been one to three months

20   prior to that I believe that was what you testified.  Is

21   that correct?

22       A.  That's about right.  Yeah.  I probably started

23   having conversations with him even before I caught

24   Gibson, so probably sometime in February I met him

25   socially, and he offered to help.  I don't know when I

1    actually legally retained him.

2       Q. And what did -- what did he offer to help you

3    with?

4       A. Anything I needed. If I needed any help with

5    anything, "Here's my card. Just call me."

6       Q. "Call me any time."

7         Where did you meet him?

8       A. I met him at a -- how did I meet him? It was I

9    think the hotel next to -- the hotel lobby next to my

10   apartment by the hospital.

11       Q. You just ran into him in the lobby?

12       A. Yeah.

13       Q. Okay. And you said you started having

14   discussions with him. What did you discuss?

15       A. I was telling him about how, you know, I was in

16   the news for getting -- I think he recognized me maybe.

17   People everywhere in Seattle knew who I was at that

18   point because I had constant news stories running about

19   "Here's this patient dying in the hospital up here, and

20   people are stealing his identity, and if anybody has any

21   information about this," and so we talked about it, and

22   he said, "If I can help in any way." It wasn't -- he

23   was an insurance litigator or something, but he said,

24   "If I can help in any way, give me a call."

25       Q. And then at some point you began talking to him

196

1   about what we'll call for lack of a better word the

2   settlement with the Seattle Cancer Care Alliance?

3       A.  Yes.  Not in that sequence, but yeah.

4       Q.  About when did you start talking to him about

5   that?

6          MR. KEATING:  Objection.  Vague.

7          THE WITNESS:  Don't know.  Sometime not far.

8   Prior to the date of that contract.

9   BY MR. WALLACH:

10       Q.  Was it a month prior?

11       A.  Maybe, approximately.

12       Q.  Maybe more, maybe less approximately?

13       A.  About there.

14       Q.  Okay.  Did you ever talk to him about your

15   interactions with the credit card companies, credit

16   issuers?

17       A.  I mean, I think I -- I mentioned it to him but

18   not in detail.

19       Q.  But you -- you told the Bank of America's fraud

20   department to send the fraud affidavit to --

21       A.  I don't know that I did.

22          MR. KEATING:  Objection to the form of the

23   question.  Assumes facts not in evidence, and then

24   argumentative in form based on those.

25   BY MR. WALLACH:

197

1    Q.  You don't remember whether you did or not?

2    A.  I don't know that I did.  They may have said,

3    "Do you have an attorney" or something, and I may have

4    said, "Well, if you need" -- I don't know.  "If you need

5    to send something to an attorney's office, you can

6    probably send it here, and I'll get it" kind of thing,

7    but I don't know if I requested them to send it to him.

8    I wasn't involved with him that deeply.

9    Q.  Okay.  And when you were discussing the

10   settlement with the Seattle Cancer Care Alliance with

11   Greg, did he ever raise the possibility of filing

12   litigation?

13   A.  He mentioned it to me that --

14       MR. KEATING:  Let me point out you have an

15   attorney-client privilege just like we discussed with

16   you and me.  You have one with that gentleman, so you

17   don't have to answer questions and you should not answer

18   questions with regard to communications that he had with

19   you in the scope of his representation.

20       THE WITNESS:  Okay.  There you go.

21   BY MR. WALLACH:

22   Q.  So you're refusing to answer?  I just want to

23   be clear for the record.

24   A.  Do you want to repeat the question?

25   Q.  I'll ask a different question.  At the time

1

2

3   STATE OF CALIFORNIA    )
                          ) ss.
4   COUNTY OF SANTA CLARA )

5

6

7        I, Irene A. Resler, a Certified Shorthand Reporter

8   in and for the State of California, hereby certify that

9   the witness in the foregoing deposition,

10                   ERIC ROBERT DREW,

11  was by me duly sworn to tell the truth, the whole truth,

12  and nothing but the truth in the within-entitled cause,

13  and that the foregoing is a full, true and correct

14  transcript of the proceedings had at taking of said

15  deposition, reported to the best of my ability and

16  transcribed under my direction.

17

18  Date: _February 3_, 20_08_.   _Irene A. Resler_
                                   CSR Number C-7685
19

20

21

22

23

24

25

# EXHIBIT 24

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4                     ---oOo---

5    ERIC ROBERT DREW,

6                  Plaintiff,

7         VS.                        No. C07 0726 SI

8    EQUIFAX INFORMATION SERVICES, LLC,
     EXPERIAN INFORMATION SOLUTIONS, INC.,
9    TRANSUNION LLC, NCAC, BANK OF AMERICA,
     FLEET CREDIT CARD SERVICE,
10   AT&T UNIVERSAL CARD SERVICES,
     CITIGROUP, BANK ONE CARDMEMBER SERVICES,
11   FIRST USA BANK, N.A. AND DOES 1-100,

12                  Defendants.
     _____/
13

14             DEPOSITION OF EVAN HENDRICKS

15                   May 5, 2008

16

17

18   Reported by:
     ANNETTE M. SNYDER
19   CSR NO. 1880
     WEICKHARDT
20

21

22

23                  LUSK & SNYDER
                3715 MONTEREY BOULEVARD
24              OAKLAND, CALIFORNIA  94619

25           (510)482-9991/FAX(510)482-1052

1    know, you are talking, speaking about an absolute.

2              Even though it was lost or stolen, somehow it

3    would still also be noted as 120 days late; have a

4    status of 120 days late balance.  That would probably be

5    a mistake, contradictory in itself; but if it did have

6    that contradictory notation, it could be negative for

7    credit score.

8              I don't expect to see that happen very often.

9    Q.        It didn't happen here, did it?

10   A.        No.  No.

11   Q.        And now -- and, of course, the Bank One

12   account is not on this credit report that you have in

13   front of you, the Old Republic; isn't that correct?

14   A.        Right.  Now before we saw that in the

15   First USA --

16   Q.        The Bank One account -- just to help you --

17   starts with the number 4388; okay?  Sometimes it's

18   listed under First USA.  There are other First USA

19   accounts that are not fraudulent.  I think everyone

20   agrees the one in dispute starts 4338 (sic).

21   A.        I think you are representing to me that it's

22   not on here.  I am willing to accept your

23   representation.

24   Q.        And let's see, just so we have the credit

25   reports in front of us that contain those accounts,

1    the Churchill letter was effective in preventing any

2    fraudulent charges on this card?

3    A.       Yes.  It played a role in that, yes.

4    Q.       And as a matter of fact, of all of the

5    accounts that are involved in this case, this is the

6    only one where the issuer sent a Churchill letter;

7    right?

8    A.       Right.  At least that I am aware of.

9    Q.       And now you say in your report, that you --

10    you say in your report, on page 33 that:  The Churchill

11    letter is an ineffective mechanism for resolving

12    suspicion.  Correct?

13    A.       Correct.

14    Q.       In this case it worked?

15    A.       It worked to an important extent, but it also

16    didn't work, because, instead of waiting for the

17    response before issuing the credit, they just go ahead

18    and issue the credit, that allows the toxic information

19    to seep in the system.  It did not work on that front.

20           That is why the information then gets parlayed

21    into the credit reporting system, and gets into his file

22    and into his report.

23    Q.       You say the "toxic information."  What are you

24    talking about, the address?

25    A.       Yeah.  The address is one thing.  The address

1  reporting by Bank One or Chase had anything to do with
2  any denial of credit at that point in time; do you?
3          MR. KEATING:  Objection; compound, vague.
4          THE WITNESS:  Just -- I mean just to the
5  extent that I answered.  I mean, like I said, it wasn't,
6  it wasn't an inaccurate, derogatory account.  I can
7  testify to that.  It was not inaccurate, derogatory
8  account, the kind of cases I am accustomed to seeing,
9  where you can say that is a major cause of credit scores
10  falling, or major because we are not going to give it to
11  you because of.
12  Q.      May of 2005, both the Chase and Bank One were
13  deleted from Mr. Drew's account?
14  A.      That's right.  It was after February of '05.
15  Fair enough.
16  Q.      The only thing that was -- about those
17  accounts that was still on the reports was the inquiry;
18  right?
19  A.      That's right.
20  Q.      And the inquiry, at that point, was at least a
21  year-and-a-half old; correct?
22  A.      Correct.  Negligible impact on the credit
23  score, yes.
24  Q.      Would it be your understanding that as of --
25  I'm only one of the defendants here.  There was credit

1          THE WITNESS:  Thank you.

2

3              EXAMINATION BY MR. WALLACH

4

5          (Off-the-record discussion.)

6          MR. WALLACH:  Back on the record.

7   Q.      I am Dave Wallach.  I represent Experian

8   Information Solutions.

9          Since you have been through many depositions

10  before, and we already went through sort of the ground

11  rules, I won't repeat that.  I want to make sure that,

12  if you don't understand anything I ask, you will ask me

13  for clarification.

14          Is that okay?

15  A.      Yes.

16  Q.      If you answer a question, I will assume you

17  understood it.  Is that okay?

18  A.      Yes.

19  Q.      I want to just briefly cover a couple of

20  issues on some areas that you went over this morning.

21          As for your education, do you have any

22  computer programming degrees?

23  A.      No.

24  Q.      Any computer programming courses you have ever

25  taken?

1    A.        No.

2    Q.        Have you ever designed a computer program of

3    any type?

4    A.        No.

5    Q.        Do you have any statistics degrees?

6    A.        No.

7    Q.        Have you ever taken any statistics courses?

8    A.        No.

9    Q.        Okay.  And on your prior expert testimony, you

10   said that in the Andrews case, that the areas within

11   which you were qualified as a expert by the Court were

12   limited.

13             What areas where you permitted to give

14   testimony in this case?

15   A.        I am hazy on this, because it's now 10 years

16   ago, and I, I just -- I know it was the extent of

17   identity theft -- well, actually it wasn't.  That what

18   is the Ninth Circuit said should have been added, but --

19   I guess it was.

20             I apologize.  I don't remember.  There is a

21   record of it.  I can go find the record and produce it

22   to you.

23   Q.        Okay.  That's okay.

24   A.        Or Dennis Day has a copy of it.

25   Q.        Do you remember what areas you were

1  differently, what have you done to me lately?

2          So if something is -- when especially a major

3  derogatory hits your credit report and it's less than a

4  year old, it has this major impact, as opposed to

5  something that is 5 years old.  You can see the

6  percentages listed out there.  That is different than

7  how many negative impacts.

8          The example is:  You owed, in collection, like

9  $4,000 collection that was owed that was 5 years old.

10  But you had a parking ticket that doubled to like $120

11  and that was this year.  The $120 ticket would have 93

12  percent negative impact, versus the 5 years old one,

13  whatever that lower rate is for 5 years old.

14  Q.          Does it -- does the number of open accounts

15  that a consumer has affect his credit scores?

16  A.          Well, it can.  There's -- in my book there's a

17  reason code:  Too many open accounts.

18          It's not necessarily a primary cause in most

19  accounts I see.

20  Q.          How about too few open accounts?

21  A.          Yes.  Same thing.

22          I use that example to explain credit.  There

23  is a reason for too few accounts; there is a reason for

24  too many.  What affects it, it all depends.  It depends

25  on all of the information weighed against all of the

1    other information.

2    Q.        And do the type of accounts affect the credit

3    score?

4    A.        Yes.

5    Q.        And does the credit limit on the accounts

6    affect the credit scores?

7    A.        Yes.

8    Q.        If you add a small number of open accounts and

9    it was the wrong type of account, that would have a

10   compound negative?

11   A.        Not be helping your score, right; and popping

12   up as a reason code.

13   Q.        Does it hurt a consumer credit score if he

14   does not have an installment loan as a credit history, a

15   mortgage or a car loan?

16   A.        Right.  That is in the category of a good mix

17   of credit.  Right at the top is a good mortgage.

18   Q.        Do you know whether the types of inquiry on a

19   consumer's credit report affects the credit score?

20   A.        They affect, or don't affect.  The hard

21   inquiries do affect the credit score, and soft inquiries

22   don't.

23   Q.        It's only a breakdown to hard and soft

24   inquiries; it's not like real estate loan, car loan,

25   credit card?

1          On page 2 you will see, at the top, Mr. Drew's
2    Experian's credit score.  And it says:  Original Score
3    729.
4          Do you see that?
5    A.        Yes.
6    Q.        So it's your understanding that is saying, on
7    September 6th, 2005, his credit score was 729?
8    A.        FICO score, yes.
9    Q.        Do you have any understanding of what that
10   "+703" is next to that number there?
11   A.        No.  I'm sorry, I don't.  I am not sure I
12   understand what that means.
13         I think he is giving a range there.  They do
14   it for all three; and so, I don't -- as a factual
15   matter, I don't know what the answer is.
16         I wonder if this is some sort of a possibility
17   score, because sometimes, you know, a creditor reports,
18   please produce all files they have.  So a consumer can
19   have multiple files, have multiple scores.  One theory,
20   it would relate to that.
21   Q.        But you don't know?
22   A.        Well, I think it's more than speculating.
23         I have seen cases where there are multiple
24   files, and multiple scores associated with the multiple
25   files.

1    Q.        Okay.  And 729, as you testified at this time,

2    is what you would consider a top-rate credit score?

3    A.        Yes.

4    Q.        And then, we referred to it just a minute

5    ago -- or you referred to it just a minute ago --

6    document marked as Exhibit 4.  We have this Exhibit 4,

7    January 21, 2005, tri-merge report.  And on that,

8    Mr. Drew's Experian credit score is listed as 746;

9    correct?

10   A.        Correct.

11   Q.        That is also a good credit score?

12   A.        Very good.

13   Q.        Do you know whether -- well, strike that.

14             So, when you say, on page 29 of your expert

15   report, that Mr. Drew's Experian credit scores dropped

16   substantially to 600, what are you basing that on?

17   A.        Well, I apologize.  I must have seen

18   something, or, you know, something that led me in that

19   direction, because I don't pull numbers out of the air.

20   But I don't know if I misspoke or misunderstood.  I

21   would have to go back and look and see if there are

22   other documents.

23             But what I think here, is that anything that I

24   have seen, you have already seen.  And so --

25   Q.        If not, I would very much like to see it.

1    2004.

2            THE WITNESS:   And your question is:   Does

3    Experian have any reason to believe that some of the

4    information --

5            I think they do.   I think they do, because,

6    one, they would have received those notices through CDIA

7    fraud exchange from Transunion.   Transunion has already

8    started moving on this stuff.   That notice goes to

9    Experian.

10           And -- and also, if Experian looked at its own

11   records, they would see that there were new addresses,

12   the new Seattle address, unconnected from Los Gatos, had

13   come on.

14           I think there were important clues there.

15   Q.        Do you know how often consumer -- how many

16   millions of consumers change address every year in the

17   United States?

18   A.        I know there are millions and millions.

19   Q.        Is it your belief every time a consumer

20   changes the address, the credit reporting agency should

21   assume there has been identity theft?

22   A.        No.   It's certainly my intention you shouldn't

23   make a caricature of my opinion; that I would never hold

24   such a ridiculous opinion as that.

25   Q.        You said they were on notice because they had

1   Q.          Okay.  So when you say that it's unlikely that

2   Experian provided any of this documentation to the

3   furnisher, you are talking about post October 2005?

4   A.          Well, for the documentation, yes.  I mean

5   from --

6   Q.          Isn't documentation the only --

7   A.          Right.  I am saying you can't provide

8   documentation it doesn't have.  You only have

9   documentation -- we both understand the sequence of

10  facts, actually.  In this case, they only had the

11  documentation when Mr. Keating sent it in.

12  Q.          Isn't it correct that Experian deleted all of

13  the items that Mr. Keating requested, in that

14  October 7th, 2005 letter, within a matter of days?

15  A.          I think I have seen references to that.  The

16  one piece of documentation Experian did have, though,

17  was the FBI letter.

18  Q.          Okay.  Okay.  At page 28 of your report, you

19  say -- you say that:  In order to ensure accuracy --

20  well, actually, strike that.

21          Okay.  At the bottom, you say:  In order to

22  know what investigative steps would be most effective in

23  resolving Mr. Drew's disputes, it is important that

24  Equifax and Experian diagnose the dispute correctly.

25  A.          Yes.

1  Q.       And is that -- that's your opinion?

2  A.       Yes.

3  Q.       And that -- in that, you're referring to

4  knowing exactly what, what type of dispute it is.  Is it

5  a mixed-file dispute, identity-theft dispute, is it a

6  status dispute, that sort of thing; is that correct?

7  A.       They need to know what is the source of the

8  inaccuracy, yes.

9  Q.       If someone disputes an account as, say, the

10 account reporting as closed and they say the account is

11 open, you are going to do a different type of dispute

12 than you are going to do if you say this account is

13 fraudulently opened by an identity thief; is that

14 correct?

15 A.       Well, I mean, I think I would like to say that

16 they have to be able to diagnose the source.  The

17 inaccuracies are based on what dispute they receive and

18 what information they have.

19 Q.       But -- and if they receive a dispute that says

20 it's an identity theft, and this account is not mine,

21 would be -- they should do one type of investigation.

22 And if they receive a dispute that says this account is

23 open, and you are saying it's closed, they should not do

24 the same type of investigation?

25 A.       On one level, I agree with you.  But on the

1   about diagnosing a dispute correctly?

2   A.       You carefully consider the dispute.  You say

3   what is the dis -- what are they disputing?  And what

4   are they disputing, what is the format of the dispute;

5   and then, what do we already know about this consumer

6   and this type of dispute?

7   Q.       When you say, "What are they disputing," are

8   you just referring to what trade line they are

9   disputing, or --

10  A.       Well, any item:  Address, trade line.  Are

11  they just disputing -- it's one thing to just dispute my

12  middle name is wrong.  It's another thing to say my

13  balance is wrong.  But -- so, what are they disputing?

14  And what information are they giving you about the

15  dispute?  What -- you know, what attachments or

16  documentation goes along with it?  What do we already

17  know?

18  Q.       It's a different thing saying "My balance is

19  wrong" than saying "This just doesn't belong to my

20  credit report at all"?

21  A.       I mean -- yeah.  The more specific -- and I

22  always tell people to be specific and concise when they

23  dispute.  That is the way to be.

24  Q.       And so, what, what should, in your opinion, a

25  credit reporting agency pay attention to when -- pay

1   careful attention to -- when it receives a dispute, to

2   diagnose it correctly?

3   A.        Pay careful attention to the dispute.  They

4   see what is being -- understand what is being disputed,

5   and also to pay careful attention to their own

6   knowledge, what records they have, what notices they

7   have received.

8           And then, just all of that information, to

9   diagnose the source of the inaccuracies, they can

10  conduct a reasonable investigation.

11  Q.        Okay.  Have you paid careful attention to

12  those things in this case, in order to determine whether

13  or not the CRAs took proper investigative steps?

14  A.        I certainly try to, yeah.

15  Q.        So, exactly what was the dispute answered by

16  Credit Line Financial in April of 2005?

17  A.        Well, best we can see is that, first, in April

18  of 2005, they disputed the account, and it was

19  interpreted by Experian to be of the status of the

20  payment history, versus closed versus open.

21  Q.        And do you have any reason to believe that,

22  that Experian misinterpreted Credit Line Financial's --

23  A.        I don't, I -- don't have, really, reason to

24  mis-believe, or believe, one way or the other.  I mean,

25  certainly not to mis-believe.

1  A.        We know he was disputing accounts that were
2  created by fraud.
3  Q.        We know now that the accounts were allegedly
4  created by fraud.  But we don't know it was communicated
5  to Experian, in any way, this account was the result of
6  fraud.  We don't know what was transmitted to Experian?
7  A.        That's true.
8  Q.        How can you opine on whether Experian
9  carefully considered what was transmitted to it, if you
10  don't know what was transmitted to it?
11  A.        I agree it's better to cross out that word
12  "letters" in that sentence.
13  Q.        Well, but again, if you cross out the word
14  "letters," and you just say "the dispute," you don't
15  know what was transmitted in the dispute, how can you
16  say Experian didn't carefully consider it?
17  A.        "Dispute" comes in context.  It's not made in
18  a vacuum.  Dispute has a source, has a -- springs from
19  something.  And Experian was familiar with what it
20  sprang from.
21  Q.        So is it your opinion that, if a consumer is a
22  victim of identity theft, and informs the CRA that the
23  consumer is a victim of identity theft, and a year and a
24  half later the consumer disputes an account on his
25  credit report -- not an identity theft account but as a,

1   the credit report says it's closed, the consumer says

2   it's open -- the credit reporting agencies should do an

3   identity theft dispute regardless?

4              MR. KEATING:  Objection to the form of the

5   question as an incomplete hypothetical; and to the

6   extent seeking to summarize his testimony, is inaccurate

7   in the summary of the testimony and the facts.

8              THE WITNESS:  So, no.  I think, rather than

9   how you characterize it, that my opinion is that

10  Experian, in those -- in this circumstance that we have

11  here, should be open to considering that identity theft

12  is involved, as opposed to its over-compartmentalized

13  response to a dispute, and failing to notice it.

14  Q.         I am just trying to -- so you are saying they

15  should have done an identity theft dispute in April of

16  2005?

17  A.         I think, for starters, they should have been

18  open for considering the theft; they should have --

19  identity theft was a factor, and that is not

20  unreasonable.

21  Q.         Do you have any idea, information, on what

22  they did or did not consider?

23  A.         Not as much information as I would like, but I

24  have read the, the expert reports, and the rebuttal

25  reports.  I think it supports my opinion.

1    they considered it?

2    A.        You said didn't do a "fraud dispute"?

3    Q.        Fraud investigation.

4    A.        I mean that is the thing -- your questions

5    just point to this problem about, you clarify this as a

6    fraud investigation, or a status investigation, or it's

7    a mixed file investigation.  When is it a reasonable

8    investigation?

9             My problem:  I don't think they did a

10   reasonable investigation.

11   Q.        Didn't you state earlier "reasonable" in that

12   investigation depends on diagnosing a problem?

13   A.        Yes.

14   Q.        What is reasonable?

15            Isn't the first thing in diagnosing the

16   problem to see what the consumer contends is inaccurate

17   about their credit report?

18   A.        Yes.

19   Q.        So if a consumer sees an item on their current

20   report is inaccurate because it's open, not that it's

21   closed, and it's being reported as it's closed, why is

22   it reasonable to say that they should do an

23   investigation, whether it even belongs to him in the

24   first place?

25   A.        Because of what they already knew about

1   follow-up dispute, because they weren't satisfied; and

2   that I remember from the documentation that they -- I

3   think they got more specific -- they said they got more

4   specific about what the source of the problem was as

5   opposed to the very first dispute.

6   Q.        Before you formulated your opinion, did you

7   consider the ACDVs produced by Equifax and Experian in

8   this case?

9   A.        Well, yeah.  I remembered that they had status

10  account on them, you know status account, slash, similar

11  to that.

12  Q.        And you looked at that before forming your

13  opinion?

14  A.        Yep.  I remember that as part of the

15  documents.

16  Q.        And you have no reason to believe that

17  incorrectly captured what Credit Line Financial

18  transmitted to Experian in that respect?

19  A.        Right.

20  Q.        Can you think of any reason why a

21  credit-repair clinic like Credit Line Financial might

22  dispute an account as open, current, when it knows the

23  account is actually not belonging to the consumer?

24  A.        Well, yeah.  Mr. Brown came up with a good

25  theory on that.  He said that because if you can make it

1    open, then you can end up helping your credit score.  If

2    it's open, that gives you length of credit history which

3    accounts for that.

4    Q.        In fact, when Equifax changed the Bank of

5    America account to a "paid as agreed" account in

6    response to the April dispute, Credit Line Financial

7    never entered them in subsequent disputes; did they?

8    A.        Not that I recall, no.

9    Q.        Now, if Credit Line Financial was trying to

10   get the accounts deleted, then why wouldn't it have --

11   can you think of any reason it wouldn't have continued

12   disputing the Equifax account, like it continued

13   disputing the Experian account?

14   A.        Well, given the confidence for you showed for

15   what they did, they --

16             (Reporter asked for repeat.)

17   A.        Competence could be one of them.

18   Q.        Your opinion is that they did not inform

19   competently?

20   A.        Yeah.  I mean, if it was a lawyer, it would be

21   malpractice.

22   Q.        And if there was a suit, they would be

23   negligent?

24   A.        That is a legal conclusion.

25   Q.        Fair enough.  But -- but it supports the

1    theory they were trying to turn the item into a positive

2    item on his credit report, rather than delete the item;

3    isn't that correct?

4            MR. KEATING:  Objection.

5            THE WITNESS:  Mr. Brown, that is a possible

6    theory he raised there.

7            MR. KEATING:  Objection.

8            MR. WALLACH:  Q.  In your understanding of

9    credit scores, that would have improved Mr. Drew's

10   credit score, to turn -- well -- strike that.

11           It would have been more beneficial for

12   Mr. Drew's credit score to have that account displayed

13   as current paid as agreed than to have it deleted

14   altogether; isn't that correct?

15   A.        Yes.  Yes.

16   Q.        Okay.  So, actually as the account was

17   displayed on Experian's credit report after the Credit

18   Line Financial dispute, it was more positive for his

19   credit score than it would have been if they had deleted

20   it; isn't that correct?

21   A.        It's correct, but I just -- to what extent

22   it's really significant is another question.

23   Q.        Okay.  We can deal with that later.

24           Now you say, on page -- I believe it's 26,

25   that Experian -- maybe it's not 26.  You say somewhere

1    from Mr. Keating, dated October 7th.

2              MR. KEATING:  Which version are you using?

3              MR. WALLACH:  PID 79.

4              MR. KEATING:  PID 79.

5              MR. WALLACH:  Yeah.

6    Q.        Could you show me where Mr. Keating threatens

7    filing a Federal lawsuit?

8              MR. KEATING:  Where in that letter?

9              MR. WALLACH:  Yes.  PID --

10             THE WITNESS:  He does not explicitly threaten

11   to file a lawsuit in this letter.

12             MR. WALLACH:  Q.  Now, isn't this the first

13   time that you know of in the record -- strike that.

14             Do you know of any evidence in the record

15   showing that Mr. Drew, or anyone acting on his behalf,

16   asked Experian to delete any of the items arising from

17   fraud, prior to this letter?

18   A.        No.  From what I recall, this was when

19   Mr. Keating got involved in the communicating.

20   Q.        Then how can you -- how can you conclude that

21   it was only by threatening a lawsuit he was able to

22   delete these accounts, when he didn't threaten a

23   lawsuit, and he never previously asked that the accounts

24   be deleted?

25             MR. KEATING:  Objection to the form of the

1   Q.          And my question is, is not so much this --

2   whether or not this letter threatens a lawsuit -- how

3   did you say? -- that Experian would not have deleted

4   the accounts earlier if it had been asked to delete the

5   accounts earlier, without a letter from an attorney,

6   when it was never asked?

7   A.          Well, okay.  It's just we don't really know.

8   We don't really know.

9   Q.          Okay.  Fair enough.

10             Okay.  Have you ever created a computer

11  program to serve as a matching system for compiling

12  consumer data, the way a credit reporting agency does?

13  A.          No.

14  Q.          Do you have the knowledge and capabilities to

15  do that?

16  A.          I have the knowledge and capabilities to pull

17  a team together to do that.

18             I am not the operations guy, in terms of

19  constructing the algorithms, but even the credit

20  reporting agency officials testified that these whole --

21  the partial match and stuff are set first by

22  subject-matter experts.  They are the ones that set the

23  goals and priorities.

24  Q.          And your opinion is that they should place

25  less reliance on the Social Security number; CRAs should

1   report, after they received information that is actually

2   fraudulent?

3   A.        Yes.

4   Q.        Isn't that one of the more stringent

5   algorithms that you are discussing?

6   A.        Yes.

7   Q.        Would that accomplish the concerns you are

8   addressing?

9   A.        If it's applied, yes.

10  Q.        But to be applied, they have to know an

11  address is fraudulent?

12  A.        Right.

13  Q.        Have you ever developed an algorithm to deal

14  with this sort of thing?

15  A.        No.

16  Q.        Have you ever tested one?

17  A.        No.

18  Q.        Do you know if it's actually possible to do

19  what you are proposing?

20  A.        Not until I work with a team to design and

21  test this.

22  Q.        It might be possible, and might not; you just

23  don't know?

24  A.        I know no one -- consumer reporting agencies

25  are not really interested in my opinion.

1       I, ANNETTE M. SNYDER, a Certified Shorthand

2  Reporter of the State of California, hereby certify

3  that the witness, EVAN HENDRICKS, in the foregoing

4  deposition was by me duly sworn to testify to the

5  truth, the whole truth and nothing but the truth in the

6  within-entitled cause; that said deposition was taken

7  at the time and place therein stated; that the

8  testimony of the said witness was reported by;

9  that the witness was given an opportunity to read and

10  correct said deposition and to subscribe the same.

11       I further certify that I am not of counsel

12  or attorney for either or any of the parties in the

13  foregoing deposition and caption named, or in any way

14  interested in the outcome of the cause named in said

15  caption.

16       IN WITNESS THEREOF, I have hereunto set my

17  hand on May 12, 2008.

18

19

20

21

22  ANNETTE M. SNYDER, CSR NO. 1880

23

24

25