1  John B. Keating (SBN148729)
   2995 Woodside Road, Suite 350
2  Post Office Box 620622
   Woodside, California  94062
3  Telephone:  (650) 851-5900
   Facsimile:   (650) 851-5912
4  E-mail: jbkeating@aol.com

5  Attorney for Plaintiff,
   ERIC ROBERT DREW
6

7                    UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9                    SAN FRANCISCO DIVISION

10

11  ERIC ROBERT DREW,                    )    **Case No.: CV 07-00726 SI**
                                         )
12            Plaintiff,                 )
                                         )    PLAINTIFF'S OPPOSITION TO
13       v.                              )    DEFENDANT EQUIFAX'S
                                         )    RENEWED MOTION FOR
14  EQUIFAX INFORMATION SERVICES LLC,    )    JUDGMENT AS A MATTER OF
    EXPERIAN INFORMATION SOLUTIONS,      )    LAW OR, IN THE ALTERNATIVE,
15  INC., TRANSUNION LLC, NCAC, BANK OF  )    MOTION FOR NEW TRIAL
    AMERICA, FLEET CREDIT CARD SERVICE,  )
16  AT&T UNIVERSAL CARD SERVICES,        )
    CITIGROUP, BANK ONE CARDMEMBER       )
17  SERVICES, FIRST USA BANK, N.A., and  )    Trial:         July 19, 2010
    DOES 1-100,                          )    Judgment:      August 5, 2010
18  and                                  )
    FIA CARD SERVICES, N.A. [Previously Doe )  Hearing Date: October 25, 2010
19  1], CITIBANK (SOUTH DAKOTA) N.A.     )    Time:          9:00 a.m.
    [Previously Doe 2], CHASE BANK USA, N.A. )  Courtroom:    10, 19th Floor
20  [Previously Doe 3]                    )
                                         )    Judge:     The Honorable Susan Illston
21            Defendants.                )
    _____  )
22

23

24

25

26

27

28

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL    Page i

1

<u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

SUMMARY OF EQUIFAX'S MOTIONS AND PLAINTIFF'S OPPOSITION . . . . . . . . . . . . . 1

     Summary of Facts and Liability Presented at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     Summary of Equifax Arguments and Plaintiff's Response . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THERE IS NO MERIT TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A
MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     Legal Standard – Motion for Judgment as a Matter of Law - FRCP Rule 50(b) . . . . . . . 2

     There Is No Merit to Defendant Equifax's Renewed Motion for Judgment as a Matter of
     Law and Criticism of Reference to the Earlier Resolved Identity Theft Fraud Accounts . 3

     Defendant Equifax's Renewed Motion as to Liability for Reinsertion And Notice of
     Results Fails to Consider the Relevant Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     Sufficient Evidence Was Presented of Willful Violation of the §1681c-2(a) and §1681i . 6

THE MOTION FOR NEW TRIAL LACKS MERIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

THE JURY'S AWARD OF COMPENSATORY AND PUNITIVE DAMAGES IS NOT SO
EXCESSIVE AS TO CONSTITUTE A VIOLATION OF EQUIFAX'S RIGHT TO DUE
PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     Legal Standard For Remittitur Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     A.    Compensatory Damages. Defendant Equifax claims that the jury's compensatory
           damages award was against "the clear weight of the evidence". On the contrary
           the evidence clearly supports Mr. Drew's claim for and the jury's award of
           compensatory damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     B.    Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     C.    Equifax incorrectly claims that the punitive damages award was not reasonable in
           light of the fact that Equifax claims its conduct was not "reprehensible". Plaintiff
           disagrees, Equifax's conduct was reprehensible . . . . . . . . . . . . . . . . . . . . . . . . 20

     D.    Defendant Equifax alleges that the punitive damages awarded by the jury are
           excessive in light of the compensatory damages. This is simply not the case. The

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page ii

punitive damages awarded by the jury are perfectly understandable and reasonable
in light of the compensatory damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E.   Defendant Equifax Incorrectly Claims the Award of Punitive Damages Far
Exceeds the Available Civil Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

F.   Defendant Equifax objects to the presentation of evidence by Evan Hendricks
regarding the 1992 States' Attorneys General Agreement of Assurances and the
1994 Federal Trade Commission (FTC) Consent Order, alleging that due process
concerns were "heightened" by the "prejudicial" admission of Mr. Hendricks'
"testimony regarding mixed-file cases" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Standard for Review of Evidentiary Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

EQUIFAX'S DUE PROCESS RIGHTS WERE NOT VIOLATED BY INCLUSION OF
PLAINTIFF'S SECTION 1681c-2 CLAIM DURING TRIAL . . . . . . . . . . . . . . . . . . . . . . 28

EQUIFAX DUE PROCESS RIGHTS WERE NOT VIOLATED BY EVIDENCE OF
EMOTIONAL DISTRESS RELATED TO THE CHICO, CALIFORNIA PROPERTIES . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TRANSCRIPT EXCERPT APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page iii

TABLE OF AUTHORITIES

<u>Cases:</u>                                                                                                    Page

*Albert v. Carovano, 851 F.2d 561 (2d Cir. 1988)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Alvarado v. Federal Express Corporation 2008 WL 744819,*
*2008 U.S. Dist. LEXIS 21269 (N.D. Cal., March 18, 2008)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Alvarado v. Federal Express Corporation* 2008 U.S. Dist. LEXIS 21269 (N.D. Cal., March 18, 2008 at Part II); 2008 WL 744819 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Bach v. First Union Nat. Bank, 486 F.3d 150, 154 n.1 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . .

*BMW of N. Am., Inc., v. Gore*, 517 U.S. 559, 576-77, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)

*Bowoto v. Chevron Corporation 2009 U.S. Dist LEXIS 21944 decided March 4, 2009* . . . . . . . . .

*Campbell v. Chase Manhattan Bank, USA, N.A.*, No. 02-3489, 2005 U.S. Dist. LEXIS 16402, 2005 WL 1514221, at *16 (D.N.J. June 27, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Cassino v. Reichhold Chem*., Inc., 817 F.2d 1338, 1342 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . .

CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc. 499 F3e 184, 195 (3d Cir. 2007) . . .

*Cortez v. Trans Union, LLC,*  2010 U.S. App. LEXIS 16772 (3d Cir. 2010) . . . . . . . . . . . . . . . .

*Cushman v. Trans Union Corp., 115 F. 3d 220, 225 (3d Cir. 1997)* . . . . . . . . . . . . . . . . . . . . . . .

*Dixon-Rollins v. Experian Info. Solutions, Inc*., 2010 U.S. Dist. LEXIS 100015, 23-24 (D. Pa. 2010)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Eminence Capital, LLC v. Aspeon, Inc.  316 F. 3rd 1048, 1051 (9th Cir. 2003)* . . . . . . . . . . . . . . .

*Forman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962)* . . . . . . . . . . . . . . . . . . . . . . . . . .

*Galindo v. Stoody Co.  793 F.2d 1502, 1513 (9th Cir. 1986)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Gryger v. Burke*, 334 U. S. 728, 732 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Guimond v. Trans Union Credit Information Company 45 F.3d 1329, 1333 (9th Cir. 1995)* . . . .

*Hanson v. Shell Oil Co., 541 F.2d 1352, 1359 (9th Cir. 1976)* . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605; 176 L. Ed. 2d 519, 2010 U.S. LEXIS 3480 (April 21, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Johansen v. Combustion Engineering, Inc. 170 F.3d 1320 at 1331 (11th Cir. 1999)* . . . . . . . . . .

*Josephs v. Pacific Bell*, 443, F.3d 1050 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Lancaster v. Norfolk & Western Ry*., 773 F.2d 807, 822 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . .

*Northrop v. Hoffman of Simsbury, Inc*., 134 F.3d 41, 46 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . .

*Passantino v. Johnson & Johnson Consumer Prods. Inc.*, 212 F. 3d 493, 513-14 (9th Cir. 2000)  .

<u>Drew v. Equifax, et al.</u>
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page iv

*Passantino v. Johnson & Johnson Consumer Prods. Inc.*, 212 F. 3d 493, 513-14 (9th Cir. 2000)  .

*Pavao v. Pagay*, 307 F. 3d 915, 918 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Philbin*, 101 F.3d at 963 n.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Pierce v. Southern Pacific Transp. Co.*, 823 F.2d 1366  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Prieto v. Paul Revere Life Ins. Co.* 354 F.3rd 1005, 1012  (9th Cir. 2004)  . . . . . . . . . . . . . . . . . .

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50, 120 S. Ct. 2097,
147 L. Ed. 2d 105 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Reynolds v. Hartford Financial Services Group, Inc.*, 435 F.3d 1081, 1098 (9th Cir. 2005) . . . . .

*Rivera v. V.I. Housing Auth*. 854 F.2d 24, 27 (3d Cir. 1988)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Roy v. Volkswagen of America, Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) . . . . . . . . . . . . . . . . . .

*Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 152 (4th Cir. Va. 2008) . . . . . . . . . . . .

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68-69 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Sullivan v. Greenwood Credit Union, 520 F.3d 70, 73 (1st Cir. 2008)* . . . . . . . . . . . . . . . . . . . . . .

*Stevensen v. TRW Inc.*, 987 F. 2nd 288, 297 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*TJX Companies, Inc. Fair and Accurate Credit Transactions Act Litigation*, MDL No. 1853, No
07-md-1853-KHV, 2008 WL 2020375 (D. Kan. May 9, 2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . .

*TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993) . . . . . . . . . . . . . . . . . .

*Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal 2004  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wynder v. McMahon*, 360 F.3d 73, 75, 77 & n.11 (2d Cir. 2004)  . . . . . . . . . . . . . . . . . . . . . . . . .


Administrative Decisions:

      1992 States' Attorneys General Agreement of Assurances . . . . . . . . . . . . . . . . . . . . . . . .

      1994 (sic) Federal Trade Commission (FTC) Consent Order . . . . . . . . . . . . . . . . . . . . . .

      Complaint and Decision and Order were issued by the Federal Trade Commission on
      August 14, 1995 (not 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      *Federal Trade Commission Decisions* 120 F.T.C. 577 . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      *Federal Trade Commission Decisions* 120 F.T.C. 579-80 . . . . . . . . . . . . . . . . . . . . . . . . .
      *Federal Trade Commission Decisions* 120 F.T.C. 580 . . . . . . . . . . . . . . . . . . . . . . . . . . . .


Statutes:

Fair Credit Reporting Act. (FCRA) 15 U.S.C. §1681 et seq

      15 U.S.C.A. 1681b (FCRA Section 604) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page v

15 U.S.C.A. 1681c-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
       1681c-2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

15 U.S.C.A. 1681e (FCRA Section 607) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

15 U.S.C.A. 1681e(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

15 U.S.C.A. 1681i (FCRA Section 611) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(5)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(5)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(5)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(5)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(5)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681i(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

15 U.S.C.A. 1681s (FCRA Section 621) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

      1681s(a) (FCRA Section 621(a)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Federal Trade Commission Act,
    Section 5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Federal Rules of Evidence
    Rule 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Rule 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Federal Rules of Civil Procedure
    Rule 15(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Rule 15(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Rule 15(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Rule 50(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Rule 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Rule 59(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Rule 59(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Rule 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page vi

## SUMMARY OF EQUIFAX'S MOTION AND PLAINTIFF'S OPPOSITION

**Summary of Facts and Liability Presented at Trial:**

The evidence at trial established that Defendant Equifax violated the Fair Credit Reporting Act by failing to investigate and delete fraudulent credit account information listed on Plaintiff Eric Drew's credit file as a result of identity theft. Equifax had a duty to conduct a reasonable investigation of the information and take certain actions such as giving notice to others and permanently blocking the fraudulent information. Rather than complying with this duty, Equifax followed a systematic practice of avoiding performing any real independent investigation. Equifax simply deferred to and parroted the response of the banks which furnished the credit information.

The evidence established that these violations harmed Plaintiff significantly, all the more so in light of Plaintiff's particularly vulnerable medical and psychological circumstances. The evidence overwhelmingly showed that Equifax did not simply make an isolated mistake as to Plaintiff. Rather, Plaintiff was harmed because Equifax followed a deliberate practice which it knows harms many consumers. Equifax continues to harm consumers by intentionally violating the FCRA with a consistent business practice that does not meaningfully comply with and is intended to sidestep the consumer protection investigation requirements of the FCRA.

Equifax admits that it's practice is to simply rely on the banks and not independently evaluate the consumer's dispute. Yet, despite the overwhelming authority to the contrary, and repeated notice to Equifax that it is in violation and harming consumers, Equifax won't change it practices, instead standing on its cover posture that the FCRA reasonable investigation duty doesn't really require it to do actual independent investigation. The jury verdict in this case punishes that improper conduct. Equifax's effort to avoid the judgment or seek remittitur, if effective, would give Equifax comfort to a conclusion that the risk of enforcement of the law is so weak as to render it economic advantageous to continue to deliberately break the law.

**Summary of Equifax Arguments and Plaintiff's Response:**

Equifax initially postures that "despite the fact that this was a case about credit reports, Plaintiff did not present any evidence at trial that he suffered any credit denials as the result of an

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page 1

1   Equifax report." (Equifax Memorandum, Dkt. 465, page1 line 3)  Plaintiff responds that

2   although Drew did in fact lose credit opportunity, denial of credit is not a prerequisite to pursuing

3   a claim for violation of the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681.   The Ninth

4   Circuit long ago expressly disposed of that issue:

5       "Accordingly, the district court erred in finding that any liability under §1681e(b) was
        predicated, as a matter of law, on the occurrence of some event - denial of credit or
6       transmission of the report to third parties ...."

7       *Guimond v. TransUnion Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995).

8       Equifax next complains that  "improper and unfairly prejudicial evidence and claims that

9   Plaintiff was permitted to present to the jury, over Equifax's objections ... deprived Equifax of its

10  right to a fair trial. (Equifax Memorandum Dkt. 465, page1 line 8).   Plaintiff responds that the

11  evidence introduced by Plaintiff at trial was relevant, permissible under law, and not prejudicial.

12      Equifax seeks judgment as a matter of law as to a some subsets of the factual bases for

13  liability.  But, as the renewed Equifax's motion does not completely dispose of all liability under

14  any subsection of the FCRA, it is ineffective and irrelevant as to the jury verdict and judgment at

15  hand.  Moreover, the motions are properly denied on their substance.

16      Defendant also contends that the award of $6,326.60 for out-of-pocket monetary loss,

17  $315,000 for emotional distress and $700,000 in punitive damages was "grossly excessive" and

18  should be remitted or a new trial should be granted.(Equifax Memorandum Dkt. 465, page1 line

19  8 -13)  Plaintiff responds that the evidence amply supports the award of realistic emotional

20  distress damages and punitive damages at a two times ration, rendering remittitur inappropriate.

21

22                  **MEMORANDUM OF POINTS AND AUTHORITIES**

23  **I.      THERE IS NO MERIT TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT
            AS A MATTER OF LAW**
24

25  **Legal Standard – Motion for Judgment as a Matter of Law - FRCP Rule 50(b):**

26      "We must view the evidence in the light most favorable to the nonmoving party –
        here, Josephs, -- and draw all reasonable inferences in that party's favor.  See
27      *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50, 120 S. Ct.
        2097, 147 L. Ed. 2d 105 (2000).  The test applied is whether the evidence permits
28      only one reasonable conclusion, and that conclusion is contrary to the jury's
        verdict.  See *Pavao v. Pagay*, 307 F. 3d 915, 918 (9th Cir. 2002)."

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page 2

1     *Josephs v. Pacific Bell*, 443, F.3d 1050, 1062 (9th Cir. 2006).

2   "The party moving for judgment as a matter of law bears a heavy burden.
    Granting a renewed motion for judgment as a matter of law is proper when the
3    evidence construed in the light most favorable to the non-moving party permits
    only one reasonable conclusion as to the verdict and that conclusion is contrary to
4    the jury's verdict."

5     *Bowoto v. Chevron Corp.* 2009 U.S. Dist. LEXIS 21944 filed March 4, 2009
     (internal citations omitted)

6

7   Although Defendant Equifax's renewed motion for judgment as a matter of law and for

new trial is based on sufficiency of evidence and criticism of evidentiary rulings at trial,

8

Defendant did not cite to the record and fails to meet its burden on the motion.[1]

9

10 **There Is No Merit to Defendant Equifax's Renewed Motion**
 **for Judgment as a Matter of Law and Criticism of Reference**
11 **to the Earlier Resolved Identity Theft Fraud Accounts:**

12   Equifax contends that the court improperly denied a prior motion for judgment as a

13 matter of law and criticizes allowance of testimony regarding (1) fraudulent accounts other than

14 the Bank of America account, (2) the psychological impact of the loss of the Chico property

15 credit opportunity, and (3) the notice Equifax received by way of the prior consent decrees and

16 agreements of assurances made regarding the FCRA investigation duties.

17   Defendant Equifax seeks judgment on and criticizes introduction of any information or

18 evidence about the First USA/Bank One account, the Chase account, and the Citibank/AT&T

19 account in its request for judgment as a matter of law on these claims (*See* Equifax's

20 Memorandum of Points and Authorities Section I(A)).   Plaintiff did not assert dispute handling

21 liability at trial for the handling of the First USA/Bank One Account.   Defendant's argument

22 fails both in that there was evidence to support liability as to the Chase and Citibank accounts

23 and in that the evidence regarding the three fraudulent accounts was relevant admissible evidence

24

25    [1] .  Defendant did not order a transcript until it was too late for consideration in
 opposition to the motion.  After receipt of the motion Plaintiff ordered a copy of the transcript,
26 but only received the transcript several days prior to the briefing deadline and Plaintiff had time
 only to partially cite to the record.  To the extent the Court determines that further citation to the
27 record is necessary to evaluate the motion, Plaintiff requests permission to supplement his
 opposition.  Plaintiff submits some testimony excerpts in an Appendix to this Memorandum.
28

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page 3

1    regarding the claims as to the handling of the fourth fraudulent account.

2         Defendant Equifax violated Section 1681i "regarding" the Chase account in several ways.

3    Equifax continued to report the Chase account until February 2005, despite notice from

4    Transunion in January 2004 that the account was being deleted as presumed fraudulent, and

5    notice in Spring of 2004 by First USA Bank to delete the First USA account.  Pursuant to

6    Equifax's policy, when it gets a notice to delete an account as fraudulent, it is to investigate and

7    delete all other challenged accounts.  Evidence was introduced that showed Equifax continued to

8    report the Chase account and reported it with a high credit limit.  See for example page EIS 1944

9    in Exh. 178 and Exh. 644, as well as the Hendricks Testimony at RT 615:19-24, RT 616:1-10

10   and 23-25, and RT 617: 1-2 as quoted in the Transcript Excerpts appended hereto. )[1]

11        Equifax also violated Section 1681i "regarding" the Chase account handling by newly

12   adding the fraudulent address reported by Chase in February 2005, despite the address first being

13   provided in a delete notice from Chase and despite having previously verified the correct address

14   in January 2004 when initially disputed by Eric Drew in the context an identity theft dispute.

15        Equifax violated Section 1681i "regarding" the Citibank account by continuing to report

16   that fraudulent account until April 2005, despite notice to remove by Transunion in January 2004

17   and by Citibank itself in April 2004. (Exh. 84).

18        Evidence of whether or not a Citibank UDF notifying Equifax to delete the Citibank

19   account was ever received was a disputed fact, for the trier of facts, namely the jury, to decide.

20   No record of a UDF was produced by Equifax, but Citibank's letter of March or April 2004 to

21   Mr. Drew (Exh 84. PID 485-496) was circumstantial evidence that the UDF was sent by Citibank

22   to the credit reporting agencies, presumably to Equifax as well.  Whether or not Equifax

23   disregarded such a UDF is very relevant to a jury's finding of Equifax misconduct or

24   mishandling of the Citibank account and, to Mr. Drew's state of mind and reasoning for not

25   pursuing that issue immediately further.  One of Equifax's defenses argued in this case is failure

26   to mitigate.

27        Introduction of evidence about these accounts is relevant to Plaintiff's case both as to the

28   improper handling of the Chase and Citibank account reporting and as to the notice Equifax had

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page 4

1   or could have if it had bothered ever to conduct an investigation.  Evidence about these three

2   accounts, in addition to the Bank of America account mishandled by Equifax  - is relevant to

3   show Mr. Drew's beliefs and state of mind respecting his ordeal in its entirety.

4

5   **Defendant Equifax's Renewed Motion as to Liability for Reinsertion**
    **<u>And Notice of Results Fails to Consider the Relevant Evidence:</u>**

6          Defendant's renewed request for judgment as a matter of law on certain subsections of

7   §1681i regarding reinvestigation and notice of results should be denied.  Equifax incorrectly

8   asserts that the records do not reflect the reinsertion of any previously deleted items of

9   information as per §1681i(a)(5)(B), 1681i(a)(5)(C), and 1681i (a)(6)).  First, Plaintiff did

10  introduce evidence of such reinsertion of previously deleted information and did argue that

11  Defendant violated all three of these sections.  See examples of Equifax violations of 1681i

12  provided below, especially numbers 8, 9, 10, and 11.  In particular, Equifax represented that it

13  corrected the improperly listed fraudulent address in April 2005 when in fac it merely moved the

14  reporting of the address to a different line of the report.  Also, Equifax represented that it blocked

15  information on the Bank of America Account as of November 30, 2005 and yet, in a credit report

16  dated December 19, 2005, the information on the Bank of America Account is present.  The jury

17  could have found such events to be either a reinsertion, a failure to block or a misrepresentation

18  constituting a failure to properly give notice of investigation results.  Any of which is a violation

19  of relevant subsections of  §1681i.

20         Further, it makes no procedural sense to go line by line through §1681i and enter

21  "judgments as a matter of law" on portions of the statute as to only some of the accounts.

22  Equifax gives no explanation of a purpose in seeking post trial judgment as a matter of law that

23  does not dispose of an entire cause of action that is the basis for the jury verdict.  It would be a

24  waste of judicial resources and would be a procedural anomaly to proceed as requested by

25  Equifax.

26         Although Equifax suggests that there is an "absence of any credible evidence" regarding

27  the reinsertion and notice of results claims about which it seeks adjudication these violations of

28  the statute were articulated and supported by the evidence presented at trial.  See Trial Exhibit

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page 5

1   references supporting claims 8,9,10, and 11, below.

2   **Sufficient Evidence Was Presented of Willful Violation of the §1681c-2(a) and §1681i:**

3   　　　　Despite Defendant Equifax's claims to the contrary, the evidence presented at trial shows

4   ample proof of Equifax's negligent and willful violation of the Fair Credit Reporting Act and the

5   trier of fact rightfully found as much and awarded out-of-pocket, emotional distress, and punitive

6   damages accordingly.  The jury's verdict should not now be overturned as a matter of law as

7   requested by Defendant.   The jury did clearly have evidence in support of its finding, including

8   the testimony of Mr. Drew, Mr. Hendricks, Ms. Leslie, Ms. Fluellen, and Mr. Lovvorn, and the

9   Exhibits outlined below, in support of each FCRA 1681i claim.

10   　　　　Equifax continues to bury its head in the sand, ignoring the reality that the law requires

11   that a credit agency perform an actual independent investigation of a consumer dispute rather

12   than deferring to the reporting bank and "parroting" the response of the bank.  The law is clear

13   that a credit agency does not comply with the investigation requirement of §1681i if it simple

14   parrots the bank response ACDV.

15   　　　　It was not unreasonable for the jury to conclude that Trans Union
16   　　　　wilfully or recklessly violated the FCRA by doing nothing more
      　　　　than "parroting information" it received from ACCB. Cushman,
17   　　　　115 F.3d at 225 ("[A] 'reinvestigation' that merely shifts the burden
      　　　　back to the consumer and the credit grantor cannot fulfill the
      　　　　obligations contemplated by the statute."); *Campbell v. Chase*
18   　　　　*Manhattan Bank, USA, N.A.*, No. 02-3489, 2005 U.S. Dist. LEXIS
      　　　　16402, 2005 WL 1514221, at (D.N.J. June 27, 2005) (parroting
19   　　　　information received from original source may be considered a
      　　　　willful violation of the FCRA). Thus, there is no basis to disturb
20   　　　　the jury's finding that Trans Union wilfully or recklessly failed to
      　　　　comply with the FCRA.
21
      　　　　*Dixon-Rollins v. Experian Info. Solutions, Inc*., 2010 U.S. Dist. LEXIS 100015,
22   　　　　23-24 (D. Pa. 2010).

23   　　　　Trans Union's refusal to modify its reinvestigation procedures and
      　　　　insistence on mimicking the original sources' responses supports
24   　　　　the conclusion that punitive damages are necessary to deter future
      　　　　violations. "[E]vidence that a defendant has repeatedly engaged in
25   　　　　prohibited conduct while knowing or suspecting that it was
      　　　　unlawful would provide relevant support for an argument that
26   　　　　strong medicine is required to cure the defendant's disrespect for
      　　　　the law." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 576-77, 116
27   　　　　S. Ct. 1589, 134 L. Ed. 2d 809 (1996). Thus, because Trans Union
      　　　　has continued to disregard its obligations despite clear judicial
28   　　　　rulings and warnings, its conduct is more reprehensible than that of
      　　　　a first time offender, requiring more severe punishment. Id. at 577.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page 6

*Dixon-Rollins v. Experian Info. Solutions, Inc.*, 2010 U.S. Dist. LEXIS 100015, 29-30 (D. Pa. 2010).

In this case, the jury's punitive damages award would be proper based on the evidence adduced at trial as to any the multiple ways that Equifax willfully failed to comply with Section 1681c-2 or 1681i of the Fair Credit Reporting Act, including by: (a) intentionally violating the requirements, (b) violating the requirements with knowledge that its handling of its duties regarding Mr. Drew violated the Fair Credit Reporting Act, (c) violating one or more of the requirements despite awareness of the deficiencies of its investigation process, (d) acting in reckless disregard of whether or not its conduct violated one or more of the requirements; (e) intentionally failing to follow reasonable procedures regarding the requirements in conscious disregard for the rights of Plaintiff or with reckless disregard of consumer rights protected by the requirements, or (f) engaging in conduct that harmed Eric Drew and was malicious, oppressive or in complete indifference to Eric Drew's safety or rights. [15 U.S.C. §1681n; *Reynolds v. Hartford Financial Services Group, Inc.*, 435 F.3d 1081, 1098 (9th Cir. 2005); *Guimond v. Trans Union Corp.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57-68 (2007); *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997); In re *TJX Companies, Inc. Fair and Accurate Credit Transactions Act Litigation*, MDL No. 1853, No 07-md-1853-KHV, 2008 WL 2020375 (D. Kan. May 9, 2008)]

At trial, Plaintiff presented evidence and testimony in support of the following Equifax violations of the Fair Credit Reporting Act §§1681c-2 and 1681i, any one of which could have been sufficient grounds for the jury's verdict:

1.      Equifax violated 15 U.S.C. §1681c-2(a) by failing to block the reporting of information in Mr. Drew's file that Mr. Drew (and later Mr. Keating) alleged was the result of identity theft not later than four (4) business days after the receipt of Mr. Drew's driver's license, a copy of the police report, identification of the fraudulent accounts by Mr. Drew and a statement from Mr. Drew that these were not his accounts or transactions [See Exhibits 30, 619, 621, 623, 625 and 642 and testimony from Eric Drew, and cross-examination testimony of Alicia Fluellen and Margaret Leslie].

1681c-2 requires that when a consumer identifies false information arising from an

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page 7

1    identity theft, Equifax must block the reporting of the information within four business days after

2    receipt of a police report.  Equifax didn't fulfill that consumer protection obligation.

3         Although Fluellen testified that Equifax received the Keating letter on 11/21/05 and

4    blocked the Bank of America account on 11/28/05, in fact Equifax did not block account until

5    12/20/05.  The account appears on the 12/19/05 credit report.  (Exhs. 13 and 622 at p. 4 (PID

6    097)).  Similarly, although Equifax sent notice to Drew on 12/20/05 that Equifax had deleted the

7    fraudulent address, in fact Equifax didn't block the address until January 2006 (Exhs. 621, 623

8    625).

9         At trial Equifax tried to pretend they didn't get Drew's letter until December; then when

10   that story was disproved attempted to blamed the problem  it on sending it to affiliate CSC based

11   on a the mailroom noticing a midwest address.  In fact the time stamp records show receipt on

12   11/07 and then again on 11/28.  Equifax first tried to deny receipt of the Drew letter based on

13   arguing to Hendricks that the stamp doesn't belong to Equifax   Later when it was clear that the

14   time stamp belongs to Equifax as it was on other letters, Equifax came up with the other story.

15   Exhs. 621-625).  Equifax was simply not credible that they would have sent the document on to

16   CSC because of the address on the USPS mailing envelope.  Ms. Fluellen admitted that they

17   opened the envelope to look at it before sending it on.  And, there is so much identifying info

18   related to California in the envelope (including reference to a claim number and social security

19   number) that Equifax could not possibly not know who it came from and had no need to send it

20   to CSC.

21   2.    Equifax violated 15 U.S.C. §1681i(a)(1)(A) by failing to initiate and conduct a reasonable

22   investigation.

23        a.    At no time during any reinvestigation did Equifax take any other action except to

24   parrot the Bank of America incorrect verification statements (ACDVs).  Examples include the

25   results of disputes from Mr. Drew dated April 7, 2005, October 6, 2005, November 18, 2005, and

26   December 27, 2005. [See testimony of Expert Evan Hendricks][2]

27        b.    There was no evidence produced at trial by Equifax or anyone else showing

28   Equifax conducted any independent investigation whatsoever [See cross-examination testimony

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page 8

1    of Alicia Fluellen and Margaret Leslie, reproduced below].

2            c.      Equifax simply relied on auto-maintenance computerized reporting until

3    November 28, 2005, when they noted that an attorney had become involved and requested that

4    Mr. Drew's consumer credit file and dispute be transferred to Equifax's consumer affairs

5    department for the first time. [See Exhibit 621 also referred to as EIS 106].

6            d.      Equifax channels consumers trying to make a dispute based on fraud into its fully-

7    automated fraud phone line where they cannot succeed in communicating to Equifax the fact of

8    "fraud" nor make formal "notice of dispute", two prerequisites imposed by Equifax (but not by

9    the FCRA) for initiating Equifax's verified victim procedure.  [See direct testimony of Eric

10   Drew, direct testimony and cross-examination testimony of Alicia Fluellen and Margaret Leslie,

11   and Equifax counsel Stewart Haskins closing argument.]

12   3.      Equifax violated 15 U.S.C. §1681i(a)(2)(A) by failing  failed to tell the banks about the

13   Mr. Drew's disputes within five (5) days of receiving a dispute from Mr. Drew.

14           a.      Equifax's documents produced in discovery and at trial show only two ACDVs

15   from Equifax to Bank of America in all of 2005 and yet there at least four known disputes made

16   by Mr. Drew in 2005.

17           b.      Bank of America was not notified of Mr. Drew's October 6, 2005 electronic

18   dispute within five (5) business days. [See Exhibit 617 ACDV dated November 1, 2005].

19           c.      Equifax failed to send ACDVs to Bank of America following receipt of written

20   disputes from Mr. Drew on October 6, 2005 (dated stamped received by Equifax on November 7,

21   2005) and from Mr. Keating (dated November 21, 2005).

22   4.      Equifax violated 15 U.S.C. §1681i(a)(2)(A) by failing to provide the banks all relevant

23   information concerning Mr. Drew's dispute.

24           a.      Equifax's April 8, 2005 ACDV did not provide Bank of America with all relevant

25   information:

26                   i.      Information that the ACDV mischaracterized Mr. Drew's dispute as a
                             "payment status" dispute;

27

28                   ii.     Information that Mr. Drew concurrently disputed the fraudulent Seattle
                             address to which the fraudulent Bank of America card had been issued;

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL   Page 9

iii.    Information that Mr. Drew was concurrently disputing the fraudulent Citibank account;

iv.    Information indicating that the fraudulent Chase account had been deleted two months earlier;

v.    Information indicating that the fraudulent Bank One account had been deleted over a year earlier;

vi.    Information that an extended fraud alert had been placed on the consumer's credit file by Equifax;

b.    Equifax's November 1, 2005 ACDV identifies the Bank of America account dispute but fails to advise Bank of America of Mr. Drew's dispute regarding the fraudulent Seattle address.

5.    Equifax violated 15 U.S.C. §1681i(a)(2)(B) by failing to promptly provide the banks with all relevant information concerning Mr. Drew's dispute received after the initial five (5) day period and before the expiration of the thirty (30) day period in which to conduct the reinvestigation.  Equifax failed to notify Bank of America that while Bank of America was processing the ACDV notice of dispute dated April 8, 2005, Equifax deleted the fraudulent Seattle address and added an extended fraud alert to Mr. Drew's credit file.  During this same time, Equifax also received a notice from Citibank  instructing Equifax to delete the Citibank account from Mr. Drew's credit file and Equifax failed to so advise Bank of America.

6.    Equifax violated 15 U.S.C. §1681i(a)(4) by failing to consider all relevant information provided by Mr. Drew within the thirty (30) day period of its reinvestigation following its receipt of notice of Mr. Drew's dispute.

a.    Equifax failed to consider the fact that other fraudulent accounts identified by Mr. Drew at the same time Mr. Drew identified the Bank of America account had already been deleted per instruction from each of the other credit grantors. [See Hendricks testimony][3]

b.    Equifax failed to consider its own fraud alert placed on Mr. Drew's credit file.

c.    Equifax failed to consider the illogical outcome of placing a derogatory status on an account, after it was listed as closed with a zero balance earlier.[See Hendricks testimony][4]

d.    Equifax failed to consider Mr. Drew's allegations of identity theft status.

e.    Equifax failed to consider that it had verified and corrected the report to list

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL Page 10

1  Drew's Los Gatos address and that Drew advised Equifax that any account issued to a Seattle

2  address was fraudulent.

3  　　　f.　　　Equifax failed to consider the echoes provided by other credit reporting agencies

4  and banks to Equifax after they deleted fraudulent accounts. [See Hendricks testimony][5]

5  　　　g.　　　Equifax made every dispute communication an isolated individual event, failing

6  to look at each in the context of all prior communication.  [See Hendricks testimony][6]

7  7.　　　Equifax violated 15 U.S.C. §1681i(a)(5)(A)(i) by failing to promptly delete or modify any

8  inaccurate, incomplete or unverifiable information following its reinvestigation.

9  　　　a.　　　A fraudulent account is by its very nature unverifiable (cannot be true or

10  accurate).  It should therefore, have been deleted. [See Hendricks testimony][7]

11  　　　b.　　　In November and December 2005, Equifax could not properly verify the accuracy

12  of the Bank of America account or the fraudulent Seattle address.  Equifax received conflicting

13  echoes and failed to delete the Seattle address after confirming the address could not be verified.

14  　　　c.　　　Following the dispute of April 8, 2005, Equifax failed to delete the fraudulent

15  Seattle address.  Equifax simply moved the Martin Luther King Jr. Way fraudulent address to

16  "former address" status, even though it could not be verified.

17  8.　　　Equifax violated 15 U.S.C. §1681i(a)(5)(B)(i) by reinserting previously deleted

18  information without first obtaining a bank certification.

19  　　　a.　　　Without first obtaining a certification, Equifax reinserted the derogatory

20  information reported by Bank of America into Mr. Drew's credit file in April 2005 after having

21  previously deleted it back in August 2004 [Exhibit 178].

22  　　　b.　　　Without first obtaining a certification, in May of 2005, Equifax modified the

23  delinquency date of the derogatory information in Mr. Drew's credit file and in September of

24  2005, Equifax reinserted the original delinquency date.

25  　　　c.　　　Without first obtaining a certification, Equifax on May 11, 2005, reinserted the

26  fraudulent Seattle address which was previously deleted on April 8, 2005.

27  9.　　　Equifax violated 15 U.S.C. §1681(a)(5)(B)(ii) by failing to notify Mr. Drew of its

28  reinsertion of previously deleted information within five (5) business days of its reinsertion of

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 11

1    said information.  Equifax failed to notify Mr. Drew of the reinsertion of the fraudulent address.

2    Equifax failed to notify Mr. Drew of the reinsertion of the derogatory information.

3    10.      Equifax violated 15 U.S.C. §1681i(a)(5)(c) by failing to maintain reasonable procedures

4    designed to prevent the reappearance in a consumer's file, and in reports on the consumer, of

5    information that is deleted.  Equifax does not implement any procedures at all to prevent

6    reinsertion of previously deleted fraudulent address information.  Equifax does not implement

7    reasonable procedures to prevent reinsertion of derogatory account status information previously

8    deleted if the account itself was not deleted.

9    11.      Equifax violated the 15 U.S.C. §1681i(a)(6) requirements regarding notice of results of

10   reinvestigation, that (A) In general.  A consumer reporting agency shall provide written notice to

11   a consumer of the results of a reinvestigation under this subsection not later than 5 business days

12   after the completion of the reinvestigation, by mail or, if authorized by the consumer for that

13   purpose, by other means available to the agency.

14          a.      On December 20, 2005, Equifax misrepresented to Mr. Drew in writing that

15   Equifax had deleted the fraudulent Seattle address, but they did not.  [See Exhibit 623].

16          b.      On May 11, 2005, Equifax's results of investigation letter addressed to Mr. Drew

17   regarding the address dispute [Exhibit 609] misrepresented that Equifax had replaced the

18   fraudulent Seattle address with the correct Los Gatos address when in fact they had retained the

19   fraudulent Seattle address as a former address [Exhibit 606].

20          The jury could have found many examples of reckless or intentional disregard of its

21   FCRA obligations in the testimony provided at trial.  Under 15 U.S.C. §1681i(a)(1)(A) a credit

22   reporting agency (CRA) shall, free of charge, conduct a reasonable reinvestigation to determine

23   whether the disputed information is inaccurate following a dispute by the consumer.  On cross

24   examination, Ms. Mary Margaret Fortson Leslie testified that Equifax does not perform any

25   investigation, reasonable or otherwise, as follows: [See Leslie testimony][8]

26          Ms. Leslie's testimony can be interpreted by a reasonable trier of fact to mean that

27   Equifax patently did not conduct a reasonable investigation into the disputed Bank of America

28   account information disputed by Mr. Drew.  In fact, not only did Equifax not conduct a

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 12

1   reasonable investigation, it never intended to do so and it procedurally accepts what the bank

2   says without question.  That is clearly intentional behavior, or at the very least reckless disregard,

3   when it is the procedure and custom of Equifax to proceed as described.

4        In another example, Equifax's witness Ms. Alicia Senora Fluellen testified that Equifax

5   trains its mail room staff to open and review correspondence to see where the consumer is

6   writing from and to forward the correspondence and all exhibits to an affiliate if coming from an

7   affiliate area.  In our case, Mr. Drew's correspondence was sent to Minnesota for handling by

8   CSC despite the fact that (1) the police report enclosed was from the Los Gatos/Monte Sereno

9   Police Department from Los Gatos, California and (2) the police report contained a victim

10  address of Old Vineyard Road, Los Gatos, California.  In the face of this hard evidence to the

11  contrary, the mail room is reported to have incorrectly determined that the consumer came from

12  Minnesota and the file was forwarded to CSC because the pre-printed USPS envelope had a pre-

13  printed return address of "United States Postal Service Mail Recovery Center, St. Paul,

14  Minnesota".  [Trial Exhibit 625].  Ms. Fluellen testified that Equifax simply "expected" that its

15  affiliate CSC would handle the file in accordance with the FCRA and block the account within

16  the statutory four (4) day period imposed by 15 U.S.C. §1681c-2.  There is no sound basis for

17  believing that Eric Drew came from Minnesota.  The USPS pre-printed form envelope was

18  properly addressed to Equifax c/o Credit Dispute Dept., P.O. Box 740236, Atlanta, GA  30374.

19  Clearly the Equifax mailroom intentionally or recklessly disregarded the obvious contents of the

20  communication and did not abide by its own policies.

21       Further, after CSC returned Mr. Drew's October 6th communication to Equifax for

22  handling (received on November 28), Equifax noted that the disputed account was to be blocked

23  November 28, 2005, but the file was still reported on Mr. Drew's credit file as of December 19th.

24  [See Fluellen testimony][9]

25       Yet a third example of willfulness could be Equifax's procedure not to involve a human

26  in a consumer's dispute until litigation is threatened.  Mr. Haskins attempted to show that Mr.

27  Drew's case was removed from auto-maintenance when the police report was received in

28  December.  Mr. Keating, however was able to show that Equifax had the police report as of

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 13

November 7, 2005, with Equifax's receipt of Mr. Drew's October 6, 2005 letter and its

attachments, including a copy of the Los Gatos Police Report, addressed to Equifax.  (See

Exhibit 155).  This Exhibit has a date received stamp of November 7, 2005 on two pages.  (See

Testimony of Eric Drew, July 22, pg. 705-706).  Yet the file was not removed from auto-

maintenance until Mr. Keating's letter, on his law office stationary, was received by Equifax in

December.  (See Exhibit 151, ACRO Maintenance Transaction Summary with "Comments – Do

Not Process Through Auto Maintenance", generated in response to Equifax's receipt of Mr.

Keating's letter dated November 18, 2005. [See Exhibit 30 and Hendricks testimony][10]

## THE MOTION FOR NEW TRIAL LACKS MERIT

### Legal Standard – Motion for New Trial – FCRP Rule 59:

When summarizing the standard to be applied to a motion for new trial concerning

*Alvarado v. Federal Express Corporation* 2008 WL 744819 and 2008 U.S. Dist. LEXIS 21269

(N.D. Cal., March 18, 2008) this Court noted:

> " The Ninth Circuit has held that "[t]he trial court may grant a new
> trial only if the verdict is contrary to the clear weight of the
> evidence, is based upon false or perjurious evidence, or to prevent
> a miscarriage of justice.'  *Passantino v. Johnson & Johnson
> Consumer Prods*. 212 F.3d 493, 510 n. 15 (9th Cir. 2000)."
>
> *Alvarado v. Federal Express Corporation* 2008 U.S. Dist. LEXIS 21269 (N.D.
> Cal., March 18, 2008 at Part II); 2008 WL 744819

In its ruling on Plaintiff's Motion for a New Trial in the case of *Bowoto v. Chevron

Corporation* 2009 U.S. Dist LEXIS 21944 decided March 4, 2009, this Court stated:

> "A trial court may grant a motion for a new trial if the verdict is 'contrary
> to the clear weight of the evidence, or is based upon evidence which is
> false, or to prevent, in the sound discretion of the trial judge, a miscarriage
> of justice."  *Roy v. Volkswagen of America, Inc*., 896 F.2d 1174, 1176 (9th
> Cir. 1990) (quoting *Hanson v. Shell Oil Co*., 541 F.2d 1352, 1359 (9th Cir.
> 1976))."

## THE JURY'S AWARD OF COMPENSATORY AND PUNITIVE DAMAGES IS NOT SO EXCESSIVE AS TO CONSTITUTE A VIOLATION OF EQUIFAX'S RIGHT TO DUE PROCESS

### Legal Standard For Remittitur Analysis:

In *Alvarado v. Federal Express Corporation,* U.S. Dist. LEXIS 21269, N.D. Cal., March

18, 2008, at Part II, Defendant sought remittitur of the damages awarded by the jury.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 14

"Defendant contends that the $500,000 award is grossly excessive and unsupported by the evidence.  The Ninth Circuit has held that a jury's finding on the amount of damages should be reversed only if the amount is "grossly excessive or monstrous,' *Zhang*, 339 F. 3d at 1040 (internal quotation marks omitted), or if the amount is 'clearly unsupported by the evidence' or 'shocking to the conscience.'  *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988) (internal quotation marks omitted).  In making this determination, the Court must focus on evidence of the qualitative harm suffered by Alvarado [plaintiff].  'The severity or pervasiveness of the conduct is relevant insofar as it provides probative evidence from which a jury may infer the nature and degree of emotional injury suffered, but direct evidence of the injury is still the primary proof.' *Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal 2004); see also *Passantino v. Johnson & Johnson Consumer Prods. Inc.*, 212 F. 3d 493, 513-14 (9th Cir. 2000) (focusing on evidence of harm suffered by plaintiff, such as anxiety and rashes)."

*Alvarado v. Federal Express Corporation* 2008 U.S. Dist. LEXIS 21269, at Part II.

**A.    Compensatory Damages.  Defendant Equifax claims that the jury's compensatory damages award was against "the clear weight of the evidence".  On the contrary the evidence clearly supports Mr. Drew's claim for and the jury's award of compensatory damages.**

In the case of *Drew v. Equifax*, the facts are abundantly clear and show a repeated conscious and willful disregard of Defendant's obligation to conduct a reasonable investigation in a timely manner into the continued reporting of illogical, inaccurate, and sometimes derogatory information about Plaintiff on his credit report.

The emotional distress award of $315,000 was supported by Mr. Drew's testimony that he suffered severe anxiety, fear, distress, sleeplessness, depression and embarrassment as a result of Equifax's failure to timely repair his credit report.  Mr. Drew's anxiety, including frequent panic attacks, nightmares, becoming tearful, and sleeplessness required psycho-therapy treatment and medication.  Mr. Drew was diagnosed with anxiety disorder, not dis-similar to post traumatic stress disorder.  Dr. Cheryl Gore-Felton testified that Mr. Drew would never fully recover from his ordeal and would be coping with his anxiety disorder for the rest of his life. [11]

The preeminent psychiatrist specialist testimony of Eric Drew's treating psychiatrist, Dr. David Spiegel, also confirmed the causal connection and extent of Mr. Drew's impairment. Dr. Spiegel, Mr. Drew's treating psychiatrist for stress, anxiety and depression testified that Mr. Drew was diagnosed with an adjustment disorder with anxious mood.[12]

Dr. Spiegel and Dr. Gore-Felton each related the psychological circumstances to the credit reporting problems.[13]

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL Page 15

1    Such extreme psychological reaction and impairment was also confirmed by each of the

2    percipient witnesses Cindy Drew, Nicole Drew and Fred Kotrozo.

3    Credit industry expert witness Evan Hendricks confirmed that such psychological damage

4    consequences can typically arise in credit reporting dispute circumstances.

5    Mr. Drew testified that he was told by his doctors that his arachnoiditis was likely

6    brought on by his failure to rest and stay still as ordered by doctors following said spinal

7    injections.  Testimony was provided at trial (by Mr. Drew, by his mother, and by his fiancée),

8    evidencing Mr. Drew's anxiety over the theft of his identity, belief that he was going to be killed

9    by the identity thief in his hospital bed, and his frustration over a lack of assistance, help, or

10   action on the part of the credit grantors and credit reporting agencies in finding the thief.

11   In light of the Court's duty to view the evidence concerning damages in a light most

12   favorable to the prevailing party, the presentation of evidence of the severity of Plaintiff's

13   emotional distress and the physical consequences thereof, the award of $315,000 in emotional

14   distress damages is a logical, reasonable determination of the jury.  While Mr. Drew was dealing

15   with the inaccurate credit reporting of derogatory comments on a fraudulent account by Equifax,

16   he was also undergoing two sessions of ablative chemo-therapy and two bone-marrow

17   transplants.  His physical condition made him unusually susceptible to emotional injury, as

18   testified to by two of his psychiatrists, Drs. Cheryl Gore-Felton and David Spiegel.  When an

19   emotional injury causes physical manifestations of distress we can see no principled reason why

20   the eggshell plaintiff doctrine should not apply.  See *Pierce v. Southern Pacific Transp. Co.*, 823

21   F.2d 1366, citing *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807, 822 (7th Cir. 1985).

22   A jury may also take into account time spent trying to resolve problems with the credit

23   reporting agency.  *See Stevensen v. TRW Inc.*, 987 F. 2nd 288, 297 (5th Cir. 1993).  Eric Drew's

24   mother, his fiancé at the time, and Eric Drew himself all testified about the significant amounts

25   of time he spent trying to clear his name and credit when he should have been resting and

26   recuperating and fighting his leukemia.

27        "[D]amages for violations of the FCRA allow recovery for
          humiliation and embarrassment or mental distress even if the
28        plaintiff has suffered no out-of-pocket losses." *Cortez v. Trans
          Union, LLC* 2010 U.S. App. LEXIS 16772 at 77 citing to *Philbin*,

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 16

1    101 F.3d at 963 n.3.

2        In determining whether a damages award is rationally based, the court must "view the

3    facts in the light most favorable to Cortez [the plaintiff]". *Cortez v. Trans Union, LLC* at 75

4    citing to *Rivera v. V.I. Housing Auth*. 854 F.2d 24, at 25 (3d Cir. 1988). In *Drew v. Equifax*,

5    there is sufficient evidence in the trial record to support the jury's compensatory award.

6    **B.    Punitive Damages**

7        The jury's finding that Equifax willfully violated the FCRA is supported by the full

8    weight of the evidence. *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 68-69 (2007).

9        In the recent case of *Dixon Rollins* a "parroting" case punitive damages award was

10   upheld based on similar recidivist conduct. The Court rejected TransUnion's argument that there

11   was insufficient evidence to support a finding of a willful violation of the FCRA. Like Equifax

12   here, TransUnion argued that its reinvestigation of the disputes was conducted in accordance

13   with its normal procedures, which were modeled on its understanding of its duties under the

14   FCRA. It contended that based on the FCRA text, regulatory guidance and relevant case law, it

15   had no warning that its reinvestigation procedures were objectively unreasonable. The Court

16   held that TransUnion's claim that the statutory text did not provide any warning that its

17   reinvestigation procedures were insufficient is wrong.

18        "Having considered the relevant guideposts, we give considerable
          weight to Trans Union's recidivist conduct in setting an appropriate
19        ratio. As discussed earlier, Trans Union had been warned
          repeatedly that its reinvestigation obligation in verifying a disputed
20        account requires more than parroting the original source's response.
          Nevertheless, it continues to ignore these judicial edicts and refuses
21        to change the way it does business. Indeed, Steve Newnom
          testified that, as a matter of policy, Trans Union will not go beyond
22        the original source to verify any dispute. See Newnom Trial Tr. at
          130. This refusal to follow judicial direction convinces us that
23        "strong medicine is required to cure the defendant's disrespect for
          the law."

24        *BMW of North America v. Gore* 517 U.S. 559 at 576-577 (1996).

25                               . . . .

26        Based on its repeated conduct, it appears that Trans Union has made a risk-benefit

27   analysis, concluding that it is worth the risk to continue doing business as usual and to ignore its

28   obligations under the FCRA. Thus, any punitive award must be of sufficient size to deter Trans

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 17

Union from disregarding its legal obligations. *Dixon-Rollins V. Experian Information Solutions, Inc.*, Dist. Court, ED Pennsylvania, 2010 No. 09-0646.

The *Gore* opinion relied upon by Equifax also notes the relevance of the recidivist factor to punitive damages evaluation.

> "Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument 577*577 that strong medicine is required to cure the defendant's disrespect for the law. See id., at 462, n. 28. Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance. See *Gryger v. Burke*, 334 U. S. 728, 732 (1948)."
> *Gore*, 517 U.S. at 577.

The *Cortez* opinion explained that the likelihood of jury displeasure over corporate insensitivity to the impact of its conduct is not a reason to reduce punitive damages:

> "We do note, however, that we are troubled by the court's reasoning in reducing the punitive damages. There is certainly nothing wrong with a jury focusing on a 'defendant's seeming insensitivity' in deciding how much to award as punitive damages. *Id*. 'Punitive damages awards are 'the product of numerous, and sometimes intangible, factors…'' … Moreover, the record certainly supports a jury becoming 'incensed' over Trans Union's 'insensitivity' to Cortez's claim, and we are hard pressed to understand the district court's reliance on that possible reaction to what Trans Union did, and/or considerations of Trans Union's fiscal wealth as reasons to reduce the punitive award."

> *Cortez v. Trans Union, LLC Cortez v. Trans Union, LLC* 2010 U.S. App. LEXIS 16772 quoting *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.* 499 F3e 184, 195 Fn 37 (3d Cir. 2007).

At trial, Plaintiff introduced evidence of Equifax's failure to reasonably reinvestigate Plaintiff's disputes. Further, evidence was introduced by Equifax's own witness, Margaret Leslie, during cross examination that Equifax performed no independent investigation to determine whether the information reported by Bank of America was accurate at all.

> "Although the parameters of a reasonable investigation will often depend on the circumstances of a particular dispute, it is clear that a reasonable reinvestigation must mean more than simply including public documents in a consumer report or making only a cursory investigation into the reliability of information that is reported to potential creditors."

> *Cortez v. Trans Union, LLC* at 58 citing to *Cushman v. Trans Union Corp.*, 115 F. 3d 220, 225 (3d Cir. 1997).

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL Page 18

1       Evidence was also introduced showing Defendant Equifax's intentional and willful

2  disregard of Mr. Drew's notices of dispute as he attempted to follow Equifax's own procedures

3  to communicate his dispute as follows:

4       (1)  Equifax witness Alicia Fluellen testified that although Mr. Drew contacted Equifax

5  by calling its Equifax-titled "fraud line" as directed, such communications did not constitute

6  either notice of fraud or a "notice of dispute" according to Equifax and procedurally nothing

7  happens as a result except that a form letter is kicked out to the consumer.  In fact, in his closing

8  argument, Mr. Haskins, counsel for Equifax, argued that Mr. Drew could not possibly have

9  disputed incorrect information on his credit report, or informed Equifax that he was in a hospital

10  suffering from leukemia, because the phone line he contacted was purely automated and unable

11  to accept any such information.  This makes Plaintiff's point exactly.  To reiterate, Equifax

12  directs victims of identity theft to contact its fraud line in the first instance, although the fraud

13  line is fully-automated and unable to process extremely relevant and important information a

14  consumer has to offer to the credit reporting agency.  Initial contact with Equifax through its

15  fraud line does not constitute reporting fraud nor a dispute according to Equifax.  A consumer

16  MUST wait for further communication from Equifax which is computer-generated and delivered

17  in boiler-plate form before Equifax will consider proceeding with the conduct of a reinvestigation

18  of a consumer dispute.  Evidence was presented regarding the historical problems with resistance

19  of Equifax to receipt of notice of dispute. [Hendricks testimony][14]

20       In sum, Equifax directs consumers who are the victims of identity theft or fraud to call its

21  fraud line.  Yet it refuses to listen to what they have to say when they call.  Equifax, by use of its

22  automated fraud response line at the beginning of its process, willfully and intentionally refuses

23  to initiate a reinvestigation even though Plaintiff argues that such initial contact should constitute

24  an initial notice of dispute.  The consumer certainly is trying to dispute to the best of his or her

25  abilities, and yet it is impossible to succeed in the first instance. Equifax refuses to initiate a

26  reinvestigation after a consumer's initial contact. (See Hendricks Testimony on cross-

27  examination[15] and on direct examination[16]]

28       (2)  Ms. Alicia Fluellen testified on July 28, 2010 that Equifax received correspondence

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 19

from Mr. Drew in its Atlanta mail room (containing, among other things, the allegedly required

police report from the Los Gatos Police Dept.). Equifax opened said correspondence (Ms.

Fluellen testified they sent an "FTP", an electronic communication of the dispute, of the contents

of the communication to CSC on the day it was received by the Equifax mailroom in Atlanta)

and rather than process such communication and information, forwarded the letter sent by Mr.

Drew along with all of its exhibits to its business partner, CSC, in Minnesota simply because the

return address on the USPS form mailing envelope was Minnesota.  Having opened and scanned

the contents, plainly coming from California, this constitutes a willful refusal to conduct a

reinvestigation, or at the very least an unreasonable delay in the conduct of a reinvestigation in

response to another notice of dispute.

Defendant Equifax alleges that the award of $700,000 in punitive damages is "grossly

excessive" as a matter of law.  This is simply not the case.  The punitive damages award is only

just over 2-to-1 times the compensatory damages award.  That is not legally "grossly excessive"

by any means.

Defendant argues that the evidence presented at trial was insufficient to support a claim

for punitive damages.

**C.     Equifax claims that the punitive damages award was not reasonable in light of the fact that Equifax claims its conduct was not "reprehensible".  Plaintiff disagrees, Equifax's conduct was reprehensible.**

The Defendant is using the three considerations for determining whether the size of a

punitive award violates the federal Constitution as outlined in *BMW of North America v. Gore*

517 U.S. 559 (1996).  In *Gore*, the Court held that the award of $2 million in punitive damages

was grossly excessive in light of the low level of the reprehensibility of the conduct and

considering the 500-to-1 ratio between the award and the actual harm to the purchaser.  In our

case, *Drew v. Equifax*, the ratio of punitive damages and actual harm to Mr. Drew is only 2.18-

to-1, barely double and nowhere near the 500-to-1 ratio of *Gore*.

Defendant Equifax's behavior was reprehensible.  Equifax chose to maximize profits at

the expense of consumers.  It maintains a fully-automated, cheap-to-operate fraud line that both

prevents consumers from providing any details of fraud or identity theft or personal

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 20

1  circumstances, and postpones any action or response required of Equifax.

2      Further, by merely parroting what credit grantors tell Equifax it tries to avoid any

3  personal liability for its duty to conduct a reasonable investigation. Equifax's complete defense

4  in Drew v. Equifax is to say that "Bank of America told us so, therefore it is not our fault."

5  Equifax takes no responsibility for its conduct, despite owning the credit reporting process and

6  making considerable sums of money from credit reporting. Equifax simply points fingers in the

7  direction of the banks and completely disregards its statutory obligation to conduct a reasonable

8  investigation. Equifax does not admit that its processes are biased against consumers. On the

9  one hand, Equifax counsel says the credit reporting industry operates in a "circle of trust"

10  between banks, consumers, and credit reporting agencies. But Equifax's own witnesses testified

11  that consumers can't be trusted and all information provided by consumers must be verified

12  (requiring police reports, driver's licenses, etc.). Yet it takes all information provided by credit

13  grantors (banks) at face value, despite obviously inconsistent and illogical consequences. Banks

14  pay credit reporting agencies fees for credit checks. Credit reporting agencies receive nowhere

15  near the compensation and income from consumers. The logical conclusion is the reprehensible

16  fact is that money talks and "truth" according to Equifax follows money. In our case the jury's

17  verdict of $700,000 in punitive damages was a conscious effort to deter future similar behavior

18  and to protect consumers.

19          **D.    Defendant Equifax alleges that the punitive damages awarded by the jury
             are excessive in light of the compensatory damages. This is simply not the
20           case. The punitive damages awarded by the jury are perfectly
             understandable and reasonable in light of the compensatory damages.**

21      As discussed above, in the *Gore* case, cited by Equifax, there was a 500-to-1 ratio

22  between the award of compensatory damages and punitive damages. In *Drew v. Equifax*, the

23  federal jury only doubled the compensatory damages it awarded. In *TXO Production Corp. v.*

24  *Alliance Resources Corp.*, 509 U.S. 443 (1993) the U.S. Supreme Court upheld an award of

25  punitive damages in the amount of $10 million even with a compensatory damages award of only

26  $19,000. The U.S. Supreme Court thus upheld an award of punitive damages with a ration of

27  more than 500 times the $19,000 compensatory damages, well beyond our 2-to-1 ratio here. An

28  important aspect of *TXO* was the admission of evidence of the defendant's aggressive and

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 21

1   fraudulent business practices throughout the country.  The Court suggested that compensatory

2   damages would not limit the punitive award if a wealthy defendant had engaged in a pattern of

3   wrongful conduct that should be deterred.

4            Equifax engages in a systematic scheme to delay response to consumers who are the

5   victims of fraud and/or identity theft by using an almost entirely automated system to respond to

6   notices of dispute by consumers.  Evidence was introduced at trial showing Plaintiff's belief and

7   experience that it takes a lawyer's involvement before an actual human employee of Equifax will

8   review a consumer's file in the vast majority of consumer disputes.   The following behaviors

9   are egregious enough to warrant the jury's punitive damages award:  (1) a failure to answer

10  phone calls (the subject of a prior agreement of assurances, [Mr. Drew testified at trial that

11  numerous of his phone calls were not answered] (2) use of an automated phone-tree system that

12  often confuses and confounds consumers, especially those who need assistance most – the

13  elderly, the sick, and the infirm, [Evidence was introduced at trial that even later when Mr. Drew

14  hired an independent credit dispute handling company to assist him that company and Equifax

15  could not achieve adequate dispute notice communication incorrectly entered codes indicating

16  that Drew was disputing a payment on the one hand ('payment dispute') and a particular charge

17  ('not his/hers') on the other, despite his best efforts to inform Equifax he was the victim of

18  identity theft and the subject accounts were not his at all],  (3) a mail room system which allows

19  mail to be re-routed and lost in transit between Equifax and its affiliates for weeks at a time,

20  delaying response time to a properly submitted notice of dispute, (4) …

21       **E.    Defendant Equifax Incorrectly Claims the Award of Punitive Damages Far
               Exceeds the Available Civil Penalties**.

22

23       First, the civil penalties comparison quidepost is not appropriately applied in this FCRA

     case.  As clarified by the recent 3rd Circuit Opinion in *Cortez v. Trans Union*:
24

25       The damages award also survives scrutiny under the second guidepost. An award that is

26  twice the compensatory damages award falls well within the Supreme Court's standard for

     ordinary cases of a single-digit ratio. Campbell, 538 U.S. at 425.
27

28       Finally, we agree with the parties that the third  [*89] guidepost is not useful in the

     analysis of punitive damages here as there is no "truly comparable" civil penalty to a FCRA

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 22

1   punitive damages award. Cortez Reply Br. at 46; Trans Union Reply Br. at 23-26.

2          *Cortez v. Trans Union, LLC*, 2010 U.S. App. LEXIS 16772 (3d Cir. Pa. Aug. 13, 2010).

3          Similarly, the Fourth Circuit opinion in *Saunders* and the Sixth Circuit in *Bach* found the

4   civil penalties guidepost to be of little use in light of the particular structure of the FCRA

5   remedies contemplated by Congress:

6          Although FCRA does place limits on civil penalties when suit is brought by the

7   government, §§ 1681s(a)(2)(A), (c)(1)(B)(iii), Congress specifically chose not to limit punitive

8   damages in suits brought by private parties, § 1681s-2. Thus, we agree with the Sixth Circuit's

9   determination that the third guidepost provides "little assistance" in FCRA suits. *Bach v. First*

10  *Union Nat. Bank*, 486 F.3d 150, 154 n.1 (6th Cir. 2007). We therefore here consider only the first

11  and second guideposts.

12         *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 152 (4th Cir. Va. 2008).

13         Second, Equifax misstates the civil penalties rates which it seeks to apply.  Even if the

14  civil penalties guidepost were to be applied, the punitive damages awarded here are not greatly

15  disproportionate.  Although Equifax suggests the applicable civil penalty is $10,000 per violation

16  pursuant to 15 U.S.C. § 45(m)(1) subsection (A).  The reality however is that for continuing

17  knowing violations, as is more similar to the facts of this case, the complimentary subsection (C)

18  would be applicable, providing for penalties of $16,000 per day. (See for example *Jerman v.*

19  *Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605; 176 L. Ed. 2d 519, 2010 U.S.

20  LEXIS 3480 (April 21, 2010)).

21         **F.    Defendant Equifax objects to the presentation of evidence by Evan
               Hendricks regarding the 1992 States' Attorneys General Agreement of**

22         **Assurances and the 1994 Federal Trade Commission (FTC) Consent Order,
               alleging that due process concerns were "heightened" by the "prejudicial"**

23         **admission of Mr. Hendricks' "testimony regarding mixed-file cases".**

24  **Standard for Review of Evidentiary Rulings**:

25         "We review 'evidentiary rulings for abuse of discretion and will not reverse absent
           some prejudice.' *Cassino v. Reichhold Chem.*, Inc., 817 F.2d 1338, 1342 (9th Cir.

26         1987)."

27         *Josephs v. Pacific Bell*, 443, F.3d 1050, 1064 (9th Cir. 2006).

28         Plaintiff's introduction of such evidence was both proper and relevant.  Testimony

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 23

1  regarding prior allegations by governmental entities of Equifax wrong-doing is relevant insofar

2  as Equifax was on notice of the inadequacy of certain procedures and responses to consumer

3  notices of dispute and its handling of reinvestigations. As such Equifax's continued use of said

4  procedures and responses is important for the finding by the jury of willfulness or reckless

5  disregard (See transcript of sidebar discussion regarding admission of the testimony)[17].

6        Equifax argues (as did its witness Lovvorn at trial) that the consent decrees and

7  agreement of assurances are irrelevant to this trial because Equifax believes those documents

8  addressed problem procedures regarding "mixed files" rather than "identity theft." As Equifax is

9  well aware, the term "Mixed Files" has its origins in the Consent Orders and Assurances of

10  Agreements that Equifax and the other two major CRA signed with both the Federal Trade

11  Commission and some 18 State Attorneys General in the early 1990s.

12        Both the FTC and State AGs came up with the term and focused on Mixed Files because

13  it was the leading cause of inaccuracy in credit reports, and spawned thousands of consumer

14  complaints. In fact, Mixed Files was the first problem identified by the FTC and State AG

15  Agreements. The Consent Orders and Agreements defined "Mixed File" as a Consumer Report

16  in which some or all of the information pertains to a person or persons other than the person who

17  is the subject of the Consumer Report.

18        Equifax makes the absurd argument that it was improper for the court to have permitted

19  Evan Hendricks' expert testimony on the consent agreements and mixed files in the identity theft

20  case of Mr. Drew. This argument is absurd for several reasons. First, as Mr. Hendricks testified,

21  identity theft (A) fits squarely into the definition of a Mixed File, as the information in Mr.

22  Drew's reports "pertained to a person other than the person who was subject of the Consumer

23  Report;" and (B) accordingly, Mr. Hendricks was correct in providing helpful, relevant and

24  reliable testimony to the jury that "identity theft" was a subcomponent of Mixed Files; and (C)

25  the reason that both mixed files and identity theft happen, and the solution to prevent them, are

26  using "Full Identifying Information," just as Equifax failed to do in Mr Drew's case, but agreed to

27  do under the Consent Orders.

28        Equifax's protests that there was no significant occurrence of identity theft in the early

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 24

1   1990s.  Equifax also argues there is no link between the two because mixed files are caused by

2   consumers are having similar identifiers, and Equifax's system wrongly merges them

3   together, while Identify theft is caused by another consumer mis-using the victim consumer's

4   identifiers, resulting in the fraudster-created accounts mixing into the victim consumer's credit

5   report.

6       Equifax's arguments miss the point. The FTC and State AGs intentionally came up with a

7   broad definition of Mixed Files because they were concerned with accuracy and fairness, and

8   they knew that having consumer B's data mixing into consumer A's file was per se inaccurate and

9   unfair.  The FTC and State AGs did not care precisely what caused Mixed Files; they simply

10  knew that they had to be stopped to the greatest extent practicable.  Courts have held that CRAs

11  are still obligated to comply with these decades-old Consent Orders.

12      This Court got it exactly correct when Equifax  raised the evidence protest at trial.  This

13  Court agreed that expert testimony about the consent agreements would help the jury understand

14  that the reckless problems in Equifax's procedures that caused Mr. Drew's inaccuracies to persist

15  were foreseeable because they were substantially similar, if not identical, to the problems that

16  caused mixed files and led to the Consent Orders.  As the Court correctly noted, Equifax was free

17  to cross-examine Mr. Hendricks about the differences between Mr. Drew's identity theft-related

18  inaccuracies/faulty reinvestigations and the mixed files inaccuracies/faulty reinvestigations that

19  the consent orders addressed.   It should be noted that Equifax/Mr. Haskins failed to

20  cross examine Mr. Hendricks on issues that would have supported his "theory" that "identity

21  theft" was not a subcomponent of Mixed Files.  Perhaps that is because even Mr. Haskins

22  himself knew that jury would see that said theory was unsupportable.

23      It should also be noted that Equifax also could have retained its own expert or rebuttal

24  expert to counter any of Mr. Hendricks' testimony, but that Equifax chose not do this either.

25      (i) 1992 States' Attorneys General Agreement of Assurances.  While mixed files are

26  mentioned in this Agreement, the text of the Agreement covers substantially more ground

27  regarding the perceived inadequacies of Equifax's procedures and its compliance (and non-

28  compliance) with the FCRA.  To the extent that the same concerns are relevant to the Drew v.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 25

1  Equifax case, Plaintiff contends that information about how long Equifax has had knowledge of

2  problems and how it has failed to remedy them is very relevant to its case. Mr. Haskins argued,

3  in his objection at trial, "…the words 'identity theft' are not even mentioned in those reports."

4  Hendricks Testimony, July 22, pg. 618, lines 10-11. That is simply because the words "identity

5  theft" did not become common vernacular for several more years. The concepts addressed in the

6  Agreement of Assurances are relevant to Mr. Drew's case (see Agreement of Assurances

7  included in Transcript Excerpt Appendix)[18]

8       Much of the language in the Agreement of Assurance later became part of the

9  Amendments to the Fair Credit Reporting Act later adopted by Congress. Evidence of Equifax's

10  agreement to abide by much of this language is relevant as to just how long Equifax has been on

11  notice of the need to improve its policies and procedures in dealing with consumer disputes. For

12  this reason it was properly introduced at trial.[Hendricks Testimony][19]

13       (ii) 1994 (sic) Federal Trade Commission (FTC) Consent Order.

14       First and foremost, the 1994 (sic) Federal Trade Commission (FTC) Consent Order is not,

15  as alleged by Defendant, purely (or even substantially) a "mixed-file case". As we will show,

16  this is a complete falsity. The Complaint accompanying the Consent Order took Equifax to task

17  for many violations of the Fair Credit Reporting Act and for many behaviors or inadequacies in

18  its procedures deemed unacceptable and related to the violation at issue in the Drew case,

19  including but not limited to:

20  (1) repeated logical errors (Para. 9);

21  (2) failing to prevent reinsertion of inaccurate or unverified information in consumer credit files

22  (Para. 13);

23  (3) failing to follow reasonable procedures to assure maximum possible accuracy of the

24  information (Para. 14);

25  (4) failing to properly reinvestigate disputes conveyed by consumers (Para. 17);

26  (5) failing to follow reasonable procedures designed specifically to resolve...(ii) the specific issue

27  raised in consumer disputes relating to inaccuracy or incompleteness, including the repeated

28  inclusion in consumer reports of previously disputed inaccurate or incomplete items (Para. 17);

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 26

(6) failing to reinvestigate consumer disputes unless the consumer complies with requirements beyond those required by the FCRA, including but not limited to:  requiring the consumer to provide copies of identifying documentation including but not limited to: driver's license, Social Security Card, and utility bills and requiring written authorization from the consumer to reinvestigate an item the consumer has disputed (Para. 19);

(7) refusing to investigate consumer disputes (Para. 20);

The Complaint and Decision and Order were issued by the Federal Trade Commission on August 14, 1995 (not 1994).  The Order reads:

"This consent order requires, among other things, a Georgia-based corporation to follow reasonable procedures to assure maximum possible accuracy when preparing credit reports as required by the Fair Credit Reporting Act and to also maintain reasonable procedures to limit the furnishing of consumer reports to the purposes listed under Section 604 of the Fair Credit Reporting Act." *Federal Trade Commission Decisions* 120 F.T.C. 577.

The Complaint put Equifax on notice that many of its procedures and behaviors were not acceptable to the Federal Trade Commission and were not considered to be compliance with the Fair Credit Reporting Act. At the very least it should have endeavored in the intervening years to improve upon its handling of those areas touched upon by the Complaint.  For these and the following reasons, Plaintiff's introduction of evidence at trial regarding the Complaint, Decision and Order is not beyond the scope of this trial. As a matter of public record, it is not prejudicial, nor is it a violation of Defendant's due process rights.

The Complaint, Decision and Order deal with many behaviors and procedures of Equifax deemed by the Federal Trade Commission to be inadequate, insufficient and unreasonable, including allegations in Paragraphs 9, 11, 13, 14, 17, 19, 20 and 21 that address issues outside the mixed file context.[See Order][20]

To the list of requirements imposed by Equifax which are above and beyond any requirements imposed by law under the FCRA, we should add "Requiring consumer to provide copies of a police report."  The witnesses for Equifax repeatedly said that production of a police report was a prerequisite to any action on the part of Equifax in response to Mr. Drew's disputes.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 27

And on top of that we should add, an FBI letter outlining the facts is insufficient to constitute a police report. Not just any police report will do, to meet Equifax's high bar for action in response to a request for assistance, a police report must contain a whole litany of information, including the words "victim of fraud" and identification of all fraudulent accounts, not just by name but by number too. None of this information is mentioned as a prerequisite for investigation or action under the FCRA. Instead of reducing the number of hoops a consumer must jump through before triggering a duty to reinvestigate consumer disputes which seems to be the purpose of Paragraphs 19 and 20 of the Complaint, Equifax added additional hoops through which a consumer must jump, including the production of a police report containing all the required information. The last paragraph in the Complaint, Par. 21 goes so far as to say, "The acts and practices set forth in this complaint as violation of the Fair Credit Reporting Act constitute unfair or deceptive acts or practices in commerce in violation of Section 5(a) of the Federal Trade Commission Act, pursuant to Section 621(a) of the Fair Credit Reporting Act."  Id. 581.

Section 1 or the Order precludes conduct related to the conduct that harmed Drew. [See Order excerpt in Transcript Appendix][21]  Mr. Hendricks testified that Equifax has not made the promised changes.[ Hendricks testimony].[22]

## III.   EQUIFAX'S DUE PROCESS RIGHTS WERE NOT VIOLATED BY INCLUSION OF PLAINTIFF'S SECTION 1681c-2 CLAIM DURING TRIAL

At trial on Thursday, July 22, 2010 while introducing evidence regarding the 15 U.S.C. §1681i liability, Plaintiff conclusively proved the 15 U.S.C. § 1681c-2(a) liability.  Specifically, there are two if not three events triggering liability which were discussed at trial and supported by the evidence produced.  First, evidence was introduced showing that following receipt of Mr. Drew's letter dated October 6, 2005 (received by Equifax November 7, 2005) [Exhibits 625 and 642], the Bank of America account was not blocked within four (4) business days (it was not blocked by November 11, 2005).  Mr. Drew's letter alleged that information in Mr. Drew's file was the result of identity theft, included a copy of Mr. Drew's driver's license, a copy of the Los Gatos Police Report, identified the fraudulent accounts by account number and included a statement from Mr. that these accounts were not his accounts or transactions.  Second, evidence

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 28

1    was introduced showing that following receipt of John Keating's letter dated November 18, 2005

2    (received by Equifax November 21, 2005) which specifically cited to § 1681c-2(a) and

3    demanded compliance with that subsection within four business days [Exhibits 30 and 619],

4    Equifax did not block the Bank of America account within four business days (it was not blocked

5    by November 28, 2005 including the Thanksgiving holiday).  Mr. Keating's letter also contained

6    a copy of Mr. Drew's driver's license, a copy of the Los Gatos Police Report, alleged that the

7    information was the result of the theft of Mr. Drew's identity, identified the fraudulent accounts

8    and included a statement that the fraudulent accounts were not Mr. Drew's accounts or

9    transactions. Evidence was introduced at trial showing that the Bank of America account was not

10   blocked until December 20, 2005 [Exhibits 621 and 623], well after the four (4) day § 1681c-2(a)

11   time limit had lapsed.  Further, the fraudulent Martin Luther King, Seattle, Washington address

12   was not blocked from Mr. Drew's credit file for yet another month, until January 14, 2006

13   [Exhibit 625].

14          Equifax complains that it was "severely prejudiced" by the inclusion of the 15 U.S.C.

15   §1681c-2(a) claim at trial.  Equifax asserts that it had no opportunity to develop its evidence with

16   respect to this claim.  However, Plaintiff's rebuttal is two-fold: (1) the facts of the claim were

17   sufficiently plead in pertinent complaint and Defendant had ample time to prepare its defense;

18   and (2) the evidence developed and presented at trial with respect to the §1681c-2(a) claim is the

19   same as that presented for the §1681i claim. The correspondence between the parties and

20   Equifax's resulting internal activity reports were produced and exhibited at trial and nothing

21   would change the dates, actions and information reflected therein.  There is no "smoking gun"

22   that Equifax could have presented had it had more time to show compliance with 15 U.S.C. §

23   1681c-2(a) that it wouldn't have presented in its 15 U.S.C. §1681i defense.

24          The liability under §1681c-2(a) arises from the same operative consumer dispute facts as

25   may trigger liability under§1681i in that § 1681c-2(a) requires blocking of identity theft accounts

26   within four days of notice of dispute while §1681i requires an investigation and correction within

27   thirty days of the same notice of dispute if the circumstances do not involve identity theft.  Hence

28   the same dispute notice from a consumer will trigger either 15 U.S.C. § 1681c-2(a) duties or 15

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 29

1    U.S.C. § 1681i duties depending on whether it includes notice of the identity theft basis for the

2    dispute.   The alternate liability provision is properly present in this case, as the proof of the

3    nature of the communication of the dispute will determine which subsection applies, rather than

4    creating an entirely new liability.

5        Previously Defendant Equifax contended that it had not received a police report and

6    identity theft dispute communication until December 2005, and had blocked the account

7    thereafter.  The better quality copies of the Defendant's produced documents which were

8    included in the Defendant's exhibit binders contained legible date stamps establishing that the

9    police report documents were received by Defendant Equifax at least a month earlier, thereby

10   establishing the liability.

11       Amendment to conform the pleadings to the evidence adduced at trial may be presented at

12   any time.  *Galindo v. Stoody Co.*  793 F.2d 1502, 1513 (9th Cir. 1986) .  Amendment to conform

13   to proof is appropriate when issues not raised by the pleadings are tried by implied consent *Prieto*

14   *v. Paul Revere Life Ins. Co.* 354 F.3rd 1005, 1012  (9th Cir. 2004).   Alternatively, upon objection

15   to evidence, where the presentation of the merits of the action will be served, leave to amend

16   must be given freely. Fed R. Civ. Proc. 15(b)(1).

17       Generally, precise specification of the statute subsection is not required in satisfaction of

18   the general notice pleadings standard. *Albert v. Carovano*, 851 F.2d 561, 571, n.3 (2d Cir. 1988)

19   ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the

20   merits of a claim.  Factual allegations alone are what matters.") [citation omitted], accord,

21   *Wynder v. McMahon*, 360 F.3d 73, 75, 77 & n.11 (2d Cir. 2004), *Northrop v. Hoffman of*

22   *Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997).

23       Rule 15 properly applies to allow the case to be heard on its merits and avoid injustice

24   resulting from strict application of pleading requirements, rather than the limited role of the

25   pleading requirements to provide the parties with fair notice of the general nature and type of

26   claims.  *Forman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962).  The policy favoring

27   leave to amend is to be applied with "extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*

28   316 F. 3rd 1048, 1051 (9th Cir. 2003).

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 30

**EQUIFAX DUE PROCESS RIGHTS WERE NOT VIOLATED BY EVIDENCE OF EMOTIONAL DISTRESS RELATED TO THE CHICO, CALIFORNIA PROPERTIES**

Defendant is wrong in arguing that the Court improperly allowed Plaintiff's evidence of his emotional distress due to the credit difficulties regarding the Chico property financing problems. Defendants wrongly suggest that the mere fact that defendant prevailed in arguing that the economic damages were speculative means that any emotional damages were also speculative. Defendant The evidence showed that the emotional reaction was not speculative but was real. Witness Fred Kotrozo testified that Drew was "Crushed. He took it very badly." [RT 745:11] Drew, his wife and his mother all also confirmed the psychological impact of the credit reporting problems.

The introduction of evidence regarding Plaintiff's emotional distress suffered as result of Equifax's incorrect reporting of the fraudulent accounts and especially the derogatory information associated therewith was properly introduced at trial and was proper for the consideration of the jury. Defendant incorrectly suggests that there was no evidence that Equifax's conduct caused the emotional distress resulting from the inability to get the desired credit. Yet both Drew and Kotrozo testified that the credit application was sidelined because of the derogatory item on the report. And, of course, the emotional distress is related to Drew's perception of the problem created by the notice of Equifax's reporting rather than contingent on the existence of proof of economic damage caused by Equifax.

The jury was specifically instructed that any argument for lost profit or economic damages arising from the two Chico properties was to be disregarded. The Court's jury instruction regarding the Chico properties was sufficient to see that the jury disregarded any economic damages in their calculation of damages to award to Plaintiff. (See Final Jury Instructions read to jury).[23]

Although Equifax again tries to argue that the harm it caused is not properly evidenced by tri merge reports, the existence of the derogatory reporting was well documented otherwise at trial, including by the evidence in Equifax' own reporting records for the time period which had been withheld until the eve of trial and produced only after it became a sanctions issue in another case where such records were not produced.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 31

1

## CONCLUSION

2          The emotional distress and punitive damages award is well supported by the evidence

3    adduced at trial.  The punitive damages award, if anything, was restrained given the recidivist

4    corporate behavior at issue, and at a two times ratio does not implicate the constitution issues

5    suggested by Defendant.

6          There was ample evidence that Equifax violated the Fair Credit Reporting Act, and did so

7    willfully, causing damage to Plaintiff, including in that:

8    1.     Equifax failed to conduct a reasonable investigation and consider all information relevant

9    to Mr. Drew's dispute.

10   2.     The notice Equifax sent to Bank of America did not contain all relevant information

11   regarding the dispute.

12   3.     Neither the fraudulent Bank of America account, the derogatory entries nor the fraudulent

13   Seattle address could have been verified by Equifax and Equifax failed to promptly delete the

14   inaccurate unverified information from Mr. Drew's credit file.

15   4.     Equifax failed to establish it followed reasonable procedures to prevent the reappearance

16   of information that had been deleted pursuant to a reinvestigation.

17   5.     Equifax failed to notify Mr. Drew within five days of reinserting deleted information.

18   6.     Equifax failed to obtain and furnish a certificate of accuracy from Bank of America prior

19   to reinserting information previously deleted from Mr. Drew's report.

20   7.     Equifax failed to block reporting of information identified as resulting from identity theft

21   within four business days after receipt of information establishing the identity theft.

22         As there is ample evidence to support this verdict and no good reason to set it aside.

23   Defendant's renewed motion for a judgment as a matter of law should be denied, and so should

24   its alternative motion for a new trial.  Defendant's due process right to a fair trial was not

25   violated.   As Mr. Hendricks put it, "So this is not a Bank of America credit report, this is an

26   Equifax credit report.  And I strongly believe and have the opinion that Equifax has to take

27   responsibility for its own reports because they're the ones that are selling it to others, and they're

28   the ones that the obligation under law."  [RT 690:14-18].  Equifax is still trying to pass the buck,

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 32

despite a perfectly reasonable jury's verdict and damages award.  This Court should reject

Equifax's motions and force Equifax to finally accept responsibility for its own actions.

Dated: September 30, 2010                    Respectfully Submitted,


_____/s/_____
John B. Keating
Attorney for Plaintiff Eric Robert Drew

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 33

**TRANSCRIPT EXCERPTS APPENDIX**

1.

**Mr. Hendricks**: [referring to Exhibit 644] Right, I'm there. This is the scan for January of '05.

**Mr. Keating**: Do you see the Chase account there?

**Mr. Hendricks**: Chase account, yes. It's the – what, third one from the bottom says Chase, Chase N.A.

**Mr. Keating**: Yes. What does that tell you about the reporting of the Chase account as of that date?

**Mr. Hendricks**: That – that date – now, this is where my memory – I believe the B code on that means lost or stolen, but if that's incorrect – it will get corrected later, hopefully. But that's my – my recollection of what the B code stands for.

**Mr. Keating**: Does that reflect that – if it's lost or stolen, that Mr. Drew took out a $7,000 credit?

**Mr**. **Hendricks**: Right. It shows that he had it, but then it was – he no longer has it because it was lost or stolen.

. . .

**Mr. Keating**: So as of that point, this reflects Drew was not successful in getting that fraudulent account off of his credit report. Is that –

**Mr. Hendricks**: Right It should have been suppressed with that P notation.

> Hendricks Testimony, July 22, pg. 615, lines 19-24, pg. 616, lines 1-10 and 23-25, and pg. 617, lines 1-2.

2.

**Mr. Hendricks:**

"And as I mentioned yesterday, Equifax would have made an effort to remember what it already knew. I think that was missing, and I think it was unreasonable. And instead, what Equifax did here was that, that ACD exchange where they submit Mr. Drew's identifiers, and Bank of America sends back a message which essentially is instructing Equifax to keep this account on Mr. Drew's file, even though a couple of years have gone by and it's been disputed repeatedly. "And I think part – the bottom line is that Equifax is taking its orders from Bank of America, rather than doing an independent and reasonable investigation it needs to do, and which I think it has a responsibility to do."

Hendricks testimony, July 22, pg. 593, lines 11-22.

"…but it's Equifax's policy not to call the disputing consumer, even if a call like that – and in my opinion, in a case like this, a call like that might have been able to resolve this thing rather quickly. But Equifax has a policy of not calling and talking to consumers. Consumers are not part of the circle of trust." *Id*., pg 594, lines 3-9.

**Mr. Haskins**: So if I understand correctly, your dispute or criticism of the ACDV process is with the way that information is captured in that process, not with the process itself? Correct?

**Mr. Hendricks**: Well, no, it's not for a complex dispute involving identity theft or mixed files, as examples, where it is the misuse or the inaccuracy of the identifiers that's contributing to the inaccuracy, that the ACDV's process, in my opinion, is not reasonably calculated to resolve the

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL Page 34

dispute because all you're doing is comparing identifiers when that's already the source of the problem.

And then the second part of it is, is that Equifax allows, as this case illustrates and other cases I've worked, even when there's important inconsistencies or discrepancies, Equifax allows the response of the creditor, their ACDV response, to drive what is the result of the reinvestigation, as opposed to Equifax taking responsibility for its own product and saying, 'This time the furnisher's wrong and the consumer's right, we've done investigation and we know to clean this up.' …

…Well, just that you rely exclusively on those identifiers, when there's so much more important information to look at, or investigative steps you could take, like calling the consumer making the dispute or carefully reviewing the information you already have in your file.  The fact in this case, you knew that he had filed the fraud alert, he had said he was a fraud victim well in advance of the 2005 dispute.

Hendricks Cross Examination Testimony, July 22,  pgs. 658-659, lines 3-13 and lines 3-11 respectively.


3.

**Mr. Keating**:  [referring to the last page of the attachment to Exhibit 30]  Is consideration of the fact that the bank itself identifies it as a fraudulent account something that Equifax should consider in parroting the verification by the bank?

**Mr. Hendricks**:  Yes.  Because the – in my opinion, a reasonable investigation is going to consider all relevant information...

Hendricks Testimony, July 22, pg. 602, lines 7-11.

**Mr. Hendricks**:  …My opinion, that's an example of something that would have been outside the tunnel vision, that these – these communications [e-OSCARs] regarding fraud would have been coming to Equifax from TransUnion and should have been carefully considered, along with the other information, as time went on and it received this – even in April, 2005, when it received this dispute.

Hendricks Re-Direct Testimony, July 22, pgs. 685-686, lines 23-25 and 1-4, respectively.


4.
_____

**Mr. Keating**: [referring to Exhibit 644, pg 1955]  ..if you look at this entry, you see where it says 'account closed by credit grantor'?

**Mr. Hendricks**:  Yes.

**Mr. Keating**:  And then later on we have documents saying what, 'account closed by consumer'?

**Mr. Hendricks**:  Yes.

**Mr. Keating**:  Is there anything significant in your view, in the reporting, between having them acknowledge that it was closed by the grantor in April of 2004, then later on it's closed again by the consumer in July, '04?

**Mr. Hendricks**:  …in terms of the continued inconsistency and how information kept getting flipped around, it was very – it was just one more sign of …being unstable…the date was closed, was put in, changed, and then taken off.  So it was very unstable…

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL Page 35

Hendricks Testimony, July 22, pg. 609-10, lines 10-25, lines 1-2 respectively.

5.

**Mr. Hendricks**:  And I think the other aspect of that is, is that when the ACDV comes back from Citibank Universal and says "delete," but it comes back from Bank of America and says, "keep it on," Eqifax just doesn't step back and see there's – you know there's some major discrepancies between those two acts and the information in the Bank of America file.
Hendricks Re-Direct Testimony, July 22, pg. 690, lines 8-13

6.

**Mr. Hendricks**:  …I mean, that really the fundamental thing, is that Equifax is sitting on the most information.  The credit grantor will have information on one consumer's account, but Equifax is sitting on this treasure trove of information about all these different accounts, and the information that we talked about earlier today showing that several fraudulent accounts had been deleted per credit grantor instructions to Equifax, and some were deleted by TransUnion because of disputes related to fraud.
So all that, I mean all that information is in the system.  So it's – I think it's incumbent upon Equifax to have that mechanism in place so, when a dispute comes in, it can just find in its files all the information that relates to that consumer.  And I think it has the capacity to do that, it just does not have the policy and practice of doing it, in disputes like Mr. Drew, because of this tunnel vision that's in the ACDV exchange process.
Hendricks Re-Direct Testimony, July 22, pg. 689, lines 1-16.

**Mr. Hendricks**:  …it's possible that these echos where transmitted to Equifax, and the – the one reason that Equifax would not have given it due regard is, it didn't have – it didn't have the mechanism in place.  So at the time that Mr. Drew disputed , say in April, 2005, Equifax did not have a mechanism to remind itself that it knew of these – these—these transmissions from TransUnion regarding fraud.
Hendricks Re-Cross, July 22, pg. 694, lines 7-13.

7.

**Mr. Haskins**:  You're saying they [*Bank of America*] didn't actually verify it, right?
**Mr. Hendricks**:  Right.  I mean you can't verify false information.  That's like Orwellian, so –
**Mr. Haskins**:  It wasn't Mr. Drew's account, they couldn't have –
**Mr. Hendricks**:  Right.
Hendricks Re-Cross Examination, July 22, pg.692, lines 9-13.

8.

**Ms. Leslie**:  Okay.  Yes.  This is a frozen scan from May 11, and this is a -- this is the Bank of America account, I believe, after the application of the response from Bank of America.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL Page 36

**Mr. Keating**:  After Equifax interpreted the Bank of America ACDV response, and input the data into Equifax's system.

**Ms. Leslie**:  Well, we don't interpret the information.  It was -- we take the information that is provided to us from Bank of America, and we post that information to the credit file as it's provided to us.

(*RT 1228:13-21,Leslie Cross Examination/Keating*)

. . .

**Ms. Leslie**:  Well, we don't  -- what we do is we provide to Bank of America the disputed information.  Bank of America responds to that dispute and tells you what it should actually be.  How they would like the account to be reported.

And, we -- we don't question them, because again, we don't have the relationship with the consumer.  We don't know whether accounts were reopened, credit was used again after the date closed.  It's -- it's -- Bank of America has to explain why they reported this account the way they did...  *(RT 1230:23- 1231:6)*

. . .

**Mr. Keating**:  And, just to make sure we're clear, then, in May of 2004, Equifax did not independently investigate whether Bank of America was making the right conclusions in their ACDV.

**Mr. Haskins**:  Objection, Your Honor.  I believe he meant 2005.

**Mr. Keating**:  Yes.

**The Court**:  Okay. In 2005.

**Ms. Leslie**:  Oh, okay.  I can answer?  Okay.  We -- we, again, don't have a relationship with the consumer.  And, there are times that we provide a request for information, and then the credit grantor responds to us.  And, it's not unusual for their response to differ from what our records had reflected.

But, again, we -- it's their reporting.  It's their account.  And so, we do take it as

-- the way that they are reporting it back to us as factual.  There's --

**Mr. Keating**:  No independent analysis on your part.  Right?

**Ms. Leslie**:  I -- no, because it's their account and their --

**Mr. Keating**:  Thank you.  *(RT 1231:13- 1232:7)pg.7 lines 1-10)*

9.

**Mr. Keating**:  ...And, although we see the [*fraudulent Bank of America*] file being reported on December 19th, and the address being reported into January, nonetheless, on 11-28 you got an indication that it's going to be blocked.

**Ms. Fluellen**:  Yes, sir.

**Mr. Keating**:  And, your testimony -- is it correct for me now to understand that the reason why Mr. Drew's dispute of 10-6-05 didn't get the same sort of treatment is it -- because it went to you affiliate, CSC?

**Ms. Fluellen**:  I don't understand your question about "same sort of treatment."

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 37

1    **Mr. Keating**: To get the four-day block.  It didn't get the four-day block, because it
     was shipped out to the affiliate, CSC.  Correct?

2    **Ms. Fluellen**: It was recognized in our mailroom as coming from an someone in an
     affiliate area.  So, that letter was sent to CSC for handling, yes.

3    **Mr. Keating**: Did they open it up before they sent it out, to see if there's something

4    urgent?  Or do they just ship it out because of the address?

     **Ms. Fluellen**: The mailroom is taught to open up the mail, to look to see where the
5    consumer is writing from.  And if it's coming from -- if it's -- appears to be coming from

6    an affiliate area, then to send it to the affiliate for processing, yes.

7

8    10.

9

     **Mr. Hendricks**: …and it only happens after the consumer's attorney gets involved.  And so
10   what – another opinion is that, I've seen this before, until there's either a threat of litigation or
     litigation you don't get a true investigation that's concerned with 'Well, what is the underlying
11   truth, and how can we restore accuracy to this consumer's file?"   Hendricks Direct Testimony,
     July 22, pg. 597-98, lines24-25 and 1-3, respectively
12
                                            ● ● ●
13

14   **Mr. Keating**: Is this the attorney communication you were referring to that triggered the
     maintenance summar, triggered the document that we just looked at?
15   **Mr. Hendricks**: Yes.  The document we looked at, which said "don't leave to auto
     maintenance," I believe was in response to this November 18th letter, which you, Mr. Keating,
16   wrote on behalf of Mr. Drew to Equifax.  Hendricks Direct Testimony, July 22, pg. 598, lines 17-
     23.
17

18   11.

19

20           **Dr. Gore-Felton**: And for Mr. Drew,  his cognitions of worry, sense of
21           impending doom; his panic symptoms, where he would wake in the middle of the
             night, feeling like he couldn't breathe, he had hard time catching his breath, his
22           heart would beat really fast, his skin would get sweaty.   Dr. Gore-Felton
             Testimony, July 21, pg. 436, lines 20-25.
23

24           **Mr. Keating**: …What do you think is the likely time period for Eric to fully
25           recover from the psychiatric conditions that were treating him for?

26                                           ● ● ●

27           **Dr. Gore-Felton**: So, it's a tough question.  When someone says "fully
             recovered," I'm going to assume that you mean completely symptom-free.
28           **Mr. Keating**: Yes.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL Page 38

1    **Dr. Gore-Felton:**  And I don't think that will ever be the case, actually.
2    **Mr. Keating**:  What, why won't it ever be the case, or probably not be the case?
     **Dr. Gore-Felton**:  Well, we know that the brain actually changes when we
3    experience traumatic stress, and the memories that are associated with traumatic
     stress can be triggered by everyday stressors.  Things that most of us would be
4    able to get by, like a bus being late, for example, can actually trigger a traumatic
     memory, and years after the event.  And so people aren't ever really quite the
5    same as they were prior to a traumatic event, and so that's why I make that
6    statement.

7                              Dr. Gore-Felton Testimony, July 21, pgs. 447-448, lines 8-10, 14-
                             25, and 1-5.

8

9    12.

10   **Dr. Spiegel**:  An adjustment disorder is basically a situation in which a person has
     more difficulty than – than usual in dealing with stress or a series of stressors.  So
11   in particular with anxious mood, what you find is that the anxiety, the sense of
     mental and physical discomfort, fearfulness, that ordinarily come with a stimulus,
12   becomes a problem that interferes with function.

13          So it's one thing if you get anxious because somebody nearly hit you while
     you were crossing the street.  It's another thing if, every time you try to cross the
14   street, you start to feel anxious, even if there's no danger.  Your heart rate goes up,
     you start to sweat, you feel nervous, you have trouble sleeping because you are
15   constantly thinking about the things that may be real stressors to you but have now
16   started to interfere with your ability to live your everyday life.

17                            Dr. Spiegel Testimony, July 21, pgs. 377-78, lines 23-25 and 1-12,
                             respectively.

18

19   **Dr. Spiegel**:  The inference of doing something like that, of discrediting him,
     stealing his credit, was that he was going to die anyway and he wouldn't be able to
20   do anything about it.  So the identity theft was kind of, for him, I think a harbinger
     of death.  It was something that would make him anxious, because you see people
21   sort of picking over the remains and taking his credit away.   Dr. Spiegel
22   Testimony, July 21, pg. 384, lines 14-20.

23   **Mr. Keating**:  And when you speak of it being intertwined, do you take any
     significance from the impact a year later, when he was released from Minnesota
24   with a – the third, the third transplant effort, and found that he had problems with
25   his credit reporting status or the status of his credit file?
                                        . . .
26   **Dr. Spiegel**:  Well, what happened in his case, and happens in many cases, is that
     if a – a problem you think was resolved is not, and it comes up again, or you face
27   another threat, it does a couple of things.  It triggers all of your network of
     memories and associates, as it did with Eric, to what happened the first time.
28   …Secondly, the essence of stress like this is helplessness, that you don't feel you

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 39

can do anything about it.  Something is happening to your identity or your credit or something else, and there's nothing you can do about it.  Things aren't going the way you want them to.

So he then did something rather out of the ordinary to do something about it.  And that, I think, for a while made him feel more in control of his life and his future.  And then you find out that it didn't work, that there's more trouble, you haven't resolved it.  So it tends to make you feel helpless. …So it adds to the sense of helplessness, which makes you anxious, instead of feeling that you've mastered your stressor.  And that's what happened to him.

> Dr. Spiegel Testimony, July 21, pgs. 385 (lines 21-25), 386 (lines 3-8 and lines 17-25) , 387 (lines 1-6).

13.

**Mr. Love**:  And this diagnosis of adjustment disorder, the experiences that he went through, you could have reached that diagnosis for him whether he had ever been the victim of identity theft or not, just based on his medical experience.  Is that fair to say?

**Dr. Spiegel**:  Well, I don't know.  I can't reinvent him without having been through that.  So at the time I saw him, my conclusion was he had an adjustment disorder, and it was related to both, and they were intertwined.

Dr. Spiegel Testimony, July 21, pgs. 427, lines 17-25

**Dr. Gore-Felton**:  …but Mr. Drew certainly spoke about his efforts to contact credit card agencies and credit reporting agencies, and his frustration with the responses that he got, which exacerbated his anxiety and worry, and his anger and irritation, quite frankly.

Dr. Gore-Felton Testimony, July 21, pg. 454, lines 8-12.

14.

**Mr. Hendricks**:  That – well, what I was saying is that the whole point is that there was this historical problem of consumers getting – being able to get through.  So Congress put in a new requirement that they had to have a toll-free number.  And in less than two years after that, the Federal Trade Commission had to bring an enforcement action, which they called Operation Busy Signal, because Equifax was not answering the phone.  And so they had one settlement, and then the FTC still did a followup enforcement action and led to a second settlement.  So there is a history with consumers having difficulty finding someone to register their disputes with, you know, human being to human being, at Equifax, yes.

> Hendricks Testimony, July 22, pgs. 594-95, lines 23-25 and 1-16 respectively.

15.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL Page 40

**Mr. Haskins**:  And if she [Alecia Fluellen] testifies that AFT on this ACIS case means that Equifax received a communication from Mr. Drew on January 20, 2004, over its automated fraud telephone line, you don't have any reason to dispute that, do you?

**Mr. Hendricks**:  No.

Mr. Haskins:  Now, if Mr. Drew contacted Dquifax on January 20, 2004, via the automated telephone fraud line, he couldn't have spoken to any person, could he?

**Mr. Hendricks**:  Correct.

**Mr. Haskins**:  And he couldn't have disputed any particular information on his credit account, right?

**Mr. Hendricks**:  Not through that channel, no.

**Mr. Haskins**:  That's right.  And he couldn't have told anyone at Equifax that he was sick, right?

**Mr. Hendricks**:  Not – not through that channel.  Not that – not as I'm familiar with it, no.

**Mr. Haskins**:  And over that automated fraud telephone line, he couldn't have told anyone that he was in the hospital.  Right?

**Mr. Hendricks**:  Right.  He would not – that – that's for punching buttons…
Hendricks Cross-Examination, July 22, pg. 630-31, lines, 14-25 and 1-8, respectively.

16.

**Mr. Hendricks**:  …So what I was pointing to in this document [referring to Exhibit 151], if you look right under where things are blacked out, it says:  'Comments – Do Not Process Through Auto Maintenance,' which is a comment where Equifax pretty much – in my opinion, they're saying, they're agreeing with me, their automated system is not going to fix Mr. Drew's problems.  And the – the notation under Consumer Affairs, that is the department that handles these sort of problems, and so they're basically agreeing that, you know, we have to get – we have to give special attention to this, we can't leave it to our automated system or it is going to continue to be inaccurate and fail to correct the inaccuracies.

**Mr. Keating**:  In your review of the files, is this the first time that you saw Equifax handling it with special attention, as opposed to the sort of auto-maintenance process?

**Mr. Hendricks**:  Yes.  That's – that's why, in my opinion, the problems persisted so long, is Equifax does not want to have a system – it doesn't have a system in place like a triage system, so it would recognize that, well, this is dispute is a little more complicated than some other types of disputes…And it was only here in – a few years later, that that finally happens, and it only happens after the consumer's attorney gets involved.  And so what – another opinion is that, I've seen this before, until there's either a threat of litigation or litigation, you don't get a true investigation…"
Hendricks testimony, July 22, pgs.597-598, lines, 1-20, 24-25, and 1-3 respectively.

17.

**The Court**:  What are you trying to use this for, to show?

**Mr. Keating**:  In response to the defense and their requirement to prove that they had knowledge of their unreasonable procedures.  And they've had many, many orders from the government to correct these procedures.  The – Counsel's incorrect in saying it's exclusively an

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL Page 41

issue of traditional mixed files, as distinguished from identity theft. Identity theft is a similar problem of a mixed identity. So –

**The Court**: Is it your view that this testimony will show whether they – whether the matter that you are complaining of was foreseeable, or whether they were on notice of the issues that were being raised earlier on through this --

**Mr. Keating**: The inadequacy of their procedures to handle and to prevent this sort of conduct.

**The Court**: Well, I'm inclined to let it in for that and let you cross-examine on the fact that these issues were mixed files and not identity theft, or identity theft appeared nowhere in it. You may certainly ask those questions. But I'll allow this in for the foreseeability in those questions

Hendricks Testimony, July 22, pg. 619-20, lines11-25 and lines 1-5 respectively

18.

The Agreement of Assurances reads in part,

. . .

"WHEREAS, the States have been concerned about certain credit reporting practices of the consumer reporting industry; and,

"WHEREAS, Equifax and the States want to ensure that consumers are treated fairly and that the process by which information is disputed and corrected is accessible and comprehensible to consumers;

"THEREFORE, the parties agree to the following:

"A. For purposes of this agreement, the following definitions shall apply:

"…8. "Equifax" means Equifax, Inc., and its wholly owned subsidiary Equifax Credit Information Services, Inc. (formerly known as The Credit Bureau Incorporated of Georgia ('CBI')), their successors, assigns, officers, agents, representatives, and employees, directly or through any corporation, subsidiary, or division engaged in credit reporting in the United States."

"B. In connection with the furnishing of Consumer Reports, Equifax will comply with the FCRA and will:

"1. Implement, utilize and maintain reasonable procedures to prevent the occurrence or reoccurrence of Mixed Files, including but not limited to accepting and using a Consumer's Full Identifying Information for matching and identification purposes.

"2. Follow reasonable procedures to assure maximum possible accuracy of the information concerning the Consumer to whom the Consumer Report relates, including but not limited to:

    "a. Maintaining reasonable procedures, before Credit Information from Subscribers of Equifax or Affiliates is utilized or disclosed by Equifax, to detect logical errors in such Credit Information; …

"6. Reinvestigate items of information, the completeness or accuracy of which is disputed by a Consumer, and thereafter record in its system the current status of such items of information, when the Consumer directly conveys the dispute to Equifax and Equifax does not have reason to believe the dispute is frivolous or

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL Page 42

irrelevant.

"a.   Such reinvestigation shall include but not be limited to:
"i.   Completing any reinvestigation, including verifying, deleting, or modifying all disputed items in the Consumer's File, within thirty (30) days of receipt of the Consumer's dispute by Equifax; provided, however, that if Equifax in good faith cannot determine the nature of the Consumer's dispute, Equifax shall attempt to determine the nature of the dispute by contacting the Consumer by mail or telephone within five (5) business days of receiving the Consumer's dispute, …

"ii. Providing to the source used to verify the disputed information, or to the Subscriber who provided the disputed information to Equifax, the nature and substance of the Consumer's dispute;

"iii.  Ensuring that every Consumer is assisted in conveying his or her dispute to the Equifax Consumer Information Service Center, that direct and efficient conveyance of disputes concerning the Consumer Reports of Affiliates is facilitated and that a Consumer need not meet any condition or requirement not set forth in section 611 of the FCRA (15 U.S.C. §1681i); …."

19.

**Mr. Keating**:  In what ways were these sorts of inaccuracies foreseeable?
**Mr. Hendricks**:  Well, it goes to the history leading up to this, that there – starting in the early 1990s, the leading cause of consumer complaints to the Federal Trade Commission was about credit bureaus, about inaccuracies, about not being responsive to correcting errors, inadequate reinvestigations.

And this was a time when there was rising publicity about the issue, independent studies, and the Federal Trade Commission and the state Attorney Generals of 18 states launched investigations, and ultimately enforcement actions, which ended up resulting in an agreement with Equifax.  …And the second thing was about the whole reinvestigation process, about when someone disputes, to have a timely resolution where you identify logical errors and get them off. …And so theses same sort of problems, you know, were – again, were very well publicized then. And they're very similar to what's happened to Drew.  And I think, in my opinion, that Equifax has not given due regard to the goals of those consent agreements, and to what it agreed to do to avoid these sorts of problems.  And that's – that's one of the reasons I thought that was foreseeable.

Hendricks Testimony, July 22, pgs. 620-21, lines 18-25, lines 1-4 and 13-24 respectively.

20.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 43

Par. 9 of the Complaint reads:

"Respondent fails to maintain reasonable procedures, including adequately monitoring, measuring, or testing its information gathering, storing, and assembling systems, to assure maximum possible accuracy of the consumer reports it furnishes.  Respondent has, for example, failed adequately to correct its computer system or implement procedures to reduce sufficiently the occurrence or reoccurrence of inaccuracies in consumer reports, including mixed files **and logical errors** (such as multiple listings of the same credit accounts opened when the consumer was a minor)." (Emphasis added)

*Federal Trade Commission Decisions* 120 F.T.C. 579-80.

Par. 11 of the Complaint reads in part: "By and through respondent's failures as alleged in paragraph nine and ten, respondent fails to take reasonable steps to reduce the incidence of inaccuracies in consumer reports, including mixed files **and inaccurate public record information.**" (Emphasis added)  *Federal Trade Commission Decisions* 120 F.T.C. 580.   Note for the record that it is not solely talking about mixed files, but mixed files are but one example of other Equifax's incidence of inaccuracies in consumer reports.  Mixed files are not the sole subject of this Consent Order.  It seeks to govern Equifax's behavior regarding maintenance of accurate consumer reports in general. To that end it is very pertinent in the matter of *Eric R. Drew v. Equifax*.

Par. 13 of the Complaint reads: "Respondent fails adequately to prevent the reappearance in consumer reports of either inaccurate or unverified information that has been previously deleted." Id. 580.

Par. 14 of the Complaint reads: "By and through the practices alleged in paragraph thirteen above, respondent has violated Section 607(b) of the Fair Credit Reporting Act by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the consumer report relates, and Section 611 of the Fair Credit Reporting Act by failing to promptly to delete inaccurate or unverified information from its consumer reports."  Id. 580

Par. 17 of the Complaint reads: "Respondent fails properly to reinvestigate disputes conveyed by consumers concerning their files, **including but not limited to failing to reinvestigate disputes as requested by consumers within a reasonable period of time, and failing to follow reasonable procedures designed specifically to resolve** (i) disputes by consumers that are due to mixed files and (ii) **the specific issue raised in consumer disputes relating to inaccuracy or incompleteness, including the repeated inclusion in consumer reports of previously disputed inaccurate or incomplete items**." (Emphasis Added) Id. 581.

Par. 19 of the Complaint reads: "Respondent in some instances fails to reinvestigate consumer disputes unless the consumer complies with requirements beyond those in Section 611 of the Fair Credit Reporting Act, including but not limited to:

"a.     Requiring the consumer to pay a fee for updating and recording the current status of disputed items;

"b.     Requiring the consumer to provide copies of identifying documentation including but not limited to: driver's license, Social Security card, and utility bills; and

"c.     Requiring written authorization from the consumer to reinvestigate an item the consumer has dispute."  Id. 581.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 44

Par. 20 of the Complaint reads: "By and through the acts and practices alleged in paragraph nineteen, respondent has violated Section 611 of the Fair Credit Reporting Act by refusing to reinvestigate consumer's disputes." Id. 581.

21.

Section 1 of the Order reads, "*It is ordered*, That Equifax, in connection with the collection, preparation, assembly, maintenance and furnishing of consumer reports and files, forthwith cease and desist from failing to: (Id. 584).

...4.    Follow reasonable procedures to assure maximum possible accuracy of the information concerning the consumer about whom the consumer report relates, as required by Section 607(b) of the FCRA.  Such procedures shall include but are not limited to reasonable procedures:   (Id. 586).

a.  To detect, before credit information is available for reporting by Equifax, logical errors in such credit information.  (Id. 586).

...c. To assure that information in a consumer's file that has been determined by Equifax to be inaccurate is not subsequently included in a consumer report furnished on that consumer. (Id. 586).

d.  To prevent furnishing any consumer report containing information that Equifax knows or has reason to believe is incorrect, including information that the consumer or the source or repository of the information has stated is not accurate (including that it does not pertain to the consumer) unless Equifax has reason to believe that the statement is frivolous or irrelevant, or upon investigation, not valid;  (Id. 586-87) ...

5.    Maintain reasonable procedures so that information disputed by a consumer that is deleted or corrected upon reinvestigation by Equifax, does not subsequently appear in uncorrected form in consumer reports pertaining to that consumer; provided, however, that if after Equifax has deleted such information from the file, Equifax reverifies such information, Equifax may reinsert such consumer reports concerning that consumer if, and only if, Equifax advises the consumer in writing that the information has been reinserted.

22.

**Mr. Hendricks**:  …And in my opinion, Equifax has not made the necessary adjustments. They have disregarded the lessons of history.  And that's why Mr. Drew had these unfortunate experiences which has gone on for years.
Hendricks Testimony, July 22, pg. 623, lines 14-17.
**Mr. Keating**:  In your review of the numerous files, and given the foreseeability, have you seen evidence of Equifax's having intent to make a change to resolve these problems?
**Mr. Hendricks**:  No.  Everything in my experience, including other cases I've worked and the history I've talked about and what we see here, leads me to the inescapable opinion that Equifax is very satisfied with the way its system works.  It's made a calculation that it's the right thing for it to do.  And it has no intention of making the changes that I think are necessary to avoid the kind of problems that happened to Mr. Drew.
Hendricks Testimony, July 22, pg. 624, lines 11-20.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 45

23.

The relevant instructions read to the jury stated:

"The elements of damages which you may consider are:  mental anguish, distress, and anxiety, and out-of-pocket monetary losses incurred as a result of the violation.  However, plaintiff is not making a claim for, and you should not award, monetary loss damages related to the Chico real estate properties.

"Which, if any, elements of damages has been proven by plaintiff is for you to decide, based upon evidence and not upon speculation, guess or conjecture.  The amount of money to be awarded for certain of these elements of damages cannot be proved in a precise dollar amount.  The law leaves the determination of such amounts to your sound judgment."

*Final Instructions to Jury* Document 445, filed 7/30/2010 pg. 9, lines 25-28, pg. 10, lines 1-3.

Drew v. Equifax, et al.
USDC, N.D. Calif No. CV 07-00726 SI

PLAINTIFF'S OPPOSITION TO EQUIFAX'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR ALTERNATIVE MOTION FOR NEW TRIAL  Page 46