1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6          FOR THE NORTHERN DISTRICT OF CALIFORNIA
7

**United States District Court**
**For the Northern District of California**

8   ERIC R. DREW,                              No. C 07-00726 SI
9              Plaintiff,                       **ORDER DENYING DEFENDANT'S**
                                                **RENEWED MOTION FOR JUDGMENT**
10      v.                                      **AS A MATTER OF LAW AND**
                                                **ALTERNATIVE MOTION FOR A NEW**
11  EQUIFAX INFORMATION SERVICES, LLC           **TRIAL**
12             Defendant.
                                         /
13

14         On November 12, 2010, the Court heard argument on defendant Equifax Information Services

15  LLC's renewed motion for judgment as a matter of law or, in the alternative, motion for new trial.

16  Having considered the arguments of counsel and the papers submitted, the Court hereby DENIES

17  defendant's motion.

18

19                                      **BACKGROUND**

20         Plaintiff Eric Drew is a cancer survivor whose identity was stolen while he was undergoing

21  treatment in Seattle in late 2003.  The instant case arises from fraudulent credit accounts opened by the

22  identity thief.  In his initial complaint, plaintiff named as defendants three banks and three credit

23  reporting agencies.  The only defendant remaining in the case is Equifax Information Services, LLC

24  ("Equifax"), one of the credit reporting agencies.

25         After going through eight months of intense cancer treatment at Stanford University, plaintiff

26  was told that "that there wasn't anything else that they could do but refer [him] to hospice care."  TR

27  168:6–24.  Plaintiff found and enrolled in an experimental bone-marrow transplant program in Seattle

28  in September 2003.  TR 170:19–171:12.  In "late October, early November" plaintiff "started receiving

1  letters from financial institutions thanking [him] for credit applications that [he] had submitted." TR

2  176:1–176:3.  He had not submitted any.  TR 176:3–176:4.

3       In December, before going through the bone-marrow transplant, plaintiff called the police

4  department in his hometown, Los Gatos, California, to file a report.  TR 182:20–182:23.  In early

5  January, after completing treatment, plaintiff asked a friend to order a credit report for him.  TR

6  185:6–185:22. Plaintiff discovered that multiple fraudulent accounts had been opened in his name, with

7  thousands of dollars of balances, at an address in Seattle that was not his.  TR 186:6–186:10.  (The

8  parties agree that three banks issued fraudulent credit cards to the identity thief in plaintiff's name.

9  Citibank issued a Citibank card.  Chase issued a Chase card and a Bank One/First USA card.  And FIA

10  issued a Fleet/Bank of America card.  *See* Doc. 327 at 1–2.)

11       Plaintiff was convinced that a hospital employee had stolen his identity, and he feared for his

12  life. TR 188:4–188:7; TR 196:20–196:21.  He called news agencies, newspapers, the FBI, police, and

13  even the Mayor to ask for help.  TR 195:19–195:25.  Eventually a local television station picked up the

14  story, and the publicity from the story helped plaintiff track down the identity thief, Richard Gibson, a

15  phlebotomist at the Cancer Center treating plaintiff.  TR 196:6–196:14, TR 201:6–203:5.  At plaintiff's

16  urging, Mr. Gibson was eventually charged with and convicted of criminal violation of the Health

17  Insurance Portability and Accountability Act ("HIPAA").  TR 222:11–223:22; TR 223:11–223:14.  It

18  was the first HIPAA conviction in the country.  TR 223:13–223:14.

19       Plaintiff's cancer treatment in Seattle was also unsuccessful, and he was told that he needed to

20  go to hospice.  Again, however, plaintiff found and enrolled in an experimental program, this time one

21  in Minnesota that would save his life.  TR 204:16–204:19; 214:21–217:2.

22       In addition to tracking down the identity thief and moving to a new hospital for a new treatment,

23  plaintiff contacted the banks that had issued the credit cards in his name and the credit reporting

24  agencies that reported the fraudulent accounts and incorrect address as belonging to plaintiff.  The

25  dispute in this case relates to plaintiff's contentions that for the next two years he was largely thwarted

26  in his attempts to convince (1) the banks to stop reporting and making inquiries about the fraudulent

27  accounts and (2) the credit reporting agencies to stop including the fraudulent accounts and incorrect

28  address on plaintiff's credit reports.  Plaintiff filed this action in San Francisco County Superior Court

on December 18, 2006, alleging a number of state and federal claims against the banks and credit reporting agencies. The defendants removed to this Court on February 5, 2007.

By the time of trial, one defendant and one claim remained. Plaintiff alleged that defendant Equifax, one of the credit reporting agencies, willfully violated the Fair Credit Reporting Act ("FCRA"). Plaintiff argued that defendant failed properly to reinvestigate and thereafter accurately report the status of the disputed Bank of America card and disputed Seattle address in the manner required by FCRA, and failed to maintain reasonable procedures to do so.

At trial, Plaintiff testified about his attempts to contact defendant to report the identity theft and request a reinvestigation in 2004 and 2005, and the results of his requests. He called as supporting witnesses his mother Cynthia Kay Drew, his former wife Nicole Floor Drew, and his friend and former colleague Fred Kotrozo. Plaintiff's expert witness, Evan Hendricks, testified not only as to the unreasonableness of defendant's reinvestigation procedures, but also as to the foreseeability of the problems that arose in this case. As part of his testimony, and over defendant's objection, Mr. Hendricks discussed a 1995 consent order between defendant and the Federal Trade Commission and a 1992 "Agreement of Assurances" between defendant and a number of states. Plaintiff also testified about significant psychological stress that he suffered due in part to defendant's FCRA violation, and he called two of his treating doctors, Drs. Spiegel and Gore-Felton, to testify as well. Plaintiff requested economic damages for money he spent on therapy and money he spent hiring an outside firm to pursue his reinvestigation requests with defendant. He also requested damages for emotional distress and punitive damages.

During the course of the trial it became clear that plaintiff was arguing that defendant had violated not only a number of FCRA requirements contained in subsections of 15 U.S.C. § 1681i, but also one contained in a subsection of 15 U.S.C. § 1681c-2. Although Section 1681c-2 was not specifically listed in the complaint, the Court determined in a written order that the operative facts in the complaint encompassed a claim under Section 1681c-2. The Court therefore permitted plaintiff to pursue its FCRA claim based on both sections of the statute. *See* Doc. 436.

Throughout the trial, the Court permitted plaintiff to present evidence that he suffered economic losses as a result of defendant's actions in relation to two investment properties in Chico that plaintiff

3

had considered buying.  Ultimately, the Court determined that defendant had presented insufficient evidence of economic loss related to the Chico properties and instructed the jury that it could not award economic damages in connection with them.  TR 1283:19–1283:21.

After a nine day trial, the jury returned a verdict finding defendant liable for willfully violating FCRA.  Doc. 446 at 1.  The jury awarded plaintiff $6,326.69 in economic damages, $315,000 in non-economic compensatory damages, and $700,000 in punitive damages.

Currently before the Court is defendant's renewed motion for judgment as a matter of law ("JMOL") or, in the alternative, motion for new trial.

**LEGAL STANDARD**

**I.      Renewed Motion for Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 10 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. Pro. 50(b).  The party moving for judgment as a matter of law bears a heavy burden. Granting a renewed motion for judgment as a matter of law is proper when the evidence construed in the light most favorable to the non-moving party permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury's verdict.  *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 181 (9th Cir. 1989).

The question in a motion for judgment as a matter of law is whether there is substantial evidence to support the jury finding for the non-moving party.  *See Johnson v. Paradise Valley Unified School Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 909 (9th Cir. 1978).  In ruling on such a motion, the trial court may not weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists to support the verdict. *See Mosesian v. Peat, Marwick, Mitchell*, 727 F.2d 873, 877 (9th Cir. 1984).  Substantial evidence is

United States District Court

For the Northern District of California

4

more than a "mere scintilla." *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Chisholm Bris. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974). Rather, it is defined as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

## II.      Remittance

The Ninth Circuit has held that a jury's finding on the amount of damages should be reversed only if the amount is "grossly excessive or monstrous," *Zhang v. American Gem Seafoods, Inc*., 339 F.3d 1020, 1040 (9th Cir. 2003), or if the amount is "clearly unsupported by the evidence" or "shocking to the conscience," *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988). In making this determination, the Court must focus on evidence of the qualitative harm suffered by plaintiff. The same consideration applies to emotional distress damages. "The severity or pervasiveness of the conduct is relevant insofar as it provides probative evidence from which a jury may infer the nature and degree of emotional injury suffered, but direct evidence of the injury is still the primary proof." *Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal. 2004); *see also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513-14 (9th Cir. 2000) (focusing on evidence of harm suffered by the plaintiff, such as anxiety and rashes).

## III.      Motion for a New Trial

Federal Rule of Civil Procedure 59(a) states, "A new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a)(1). As the Ninth Circuit has noted, "Rule 59 does not specify the grounds on which a motion for a new trial may be granted." *Zhang*, 339 F.3d at 1035. Instead, the court is "bound by those grounds that have been historically recognized." *Id.* "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 728 (9th

Cir. 2007) (*quoting Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino*, 212 F.3d at 510 n. 15.

## DISCUSSION

### I.      JMOL regarding liability

Defendant argues that JMOL should be entered in its favor with respect to three different aspects of plaintiff's claim.  First, it argues that JMOL should be entered regarding three of the four fraudulently issued credit cards: the First USA/Bank One card; the Chase card; and the Citibank card.  Second, it argues that JMOL should be entered on plaintiff's FCRA claims made under three subsections of FCRA: 1681i(a)(5)(B), 1681i(a)(5)(c), and 1681(a)(6).  Third, it argues that JMOL should be entered on the wilfulness question, which would mean that plaintiff would not be entitled to punitive damages.  *See* 15 U.S.C. § 1681n(a)(1)(2).

### A.      The three cards and the three claims

Plaintiff argues, correctly, that JMOL is inappropriate where any bases for liability remain. This case proceeded to trial on a single FCRA claim.  Although the Court instructed the jury regarding a variety of FCRA provisions that could give rise to liability, plaintiff made a single FCRA claim and the verdict form asked for a single finding as to whether defendant violated FCRA willfully, negligently, or not at all.  *See* Doc. 446.  Defendant concedes that plaintiffs presented sufficient evidence at trial to support the jury's verdict, at least with regard to negligent violation of FCRA.  Therefore, defendant is not entitled to the entry of a verdict in its favor.[1]

---

[1]      To the extent that defendant believes that it is entitled to a new trial, the three cards and three claims are discussed in more detail below.

**B.      Willful violation of FCRA and punitive damages**

Defendant argues more narrowly that it is entitled to JMOL on the question of willfulness and, therefore, punitive damages.

"Any person who willfully fails to comply with any requirement imposed [by FCRA] with respect to any consumer is liable to that consumer [for] . . . punitive damages." 15 U.S.C. § 1681n(a)(1)(2). "[R]eckless disregard of a requirement of FCRA would qualify as a willful violation within the meaning of § 1681n(a)." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 71 (2007).

Defendant argues that it did not act recklessly. Defendant acknowledges, for example, that its response to plaintiff's April 2005 dispute of the Bank of America card was erroneously to show that the account had been closed with zero balance. But it argues that this error posed little risk of damage to plaintiff or his credit rating, and in fact did not result in any denial of credit. Defendant argues that the risk of harm was decreased further when it removed the card entirely from the report two months after receiving a police report from plaintiff.

Defendant's position seems to arise out of the *Safeco* Court's discussion of recklessness. The *Safeco* Court explained that recklessness generally is an "action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68 (internal quotation marks omitted). Defendant reads this to require that a plaintiff consumer show that a credit reporting agency risked harming the plaintiff consumer economically before being entitled to punitive damages. As the rest of *Safeco* makes clear, however, FCRA is concerned with whether the defendant ran an unjustifiably high risk of *violating the law*. *See id.* at 69 ("Thus, a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.").

Plaintiff presented sufficient evidence for a reasonable jury to find that defendant ran an unjustifiably high risk of violating FCRA. Plaintiff's expert, Evan Hendricks, testified regarding the reasonableness of defendant's reinvestigation procedures. He testified that defendant's violation of FCRA was foreseeable. *See* TR 620:18–624:20. In particular, he testified that defendant had long had a policy of deferring to the reporting bank rather than performing independent investigations of

7

consumer disputes.  TR 593:11–593:22.[2]  He testified that defendant was on notice regarding the possible problems with this method of reinvestigation, particularly where the consumer dispute stems from confusion over the identity of the person utilizing credit rather than confusion over the fact of or timing of payments.  TR 621:5–621:15 (discussing defendant's earlier problems preventing mixed files—"when information on Consumer B was mixed into the file of Consumer A"—and problems reaching "timely resolution" through the "reinvestigation process").

Moreover, Mr. Hendricks testified that defendant long ago acknowledged these problems when it entered into agreements with the FTC and several states about reinvestigation of mixed files.  TR 620:20–621:4, 621:16–621:24.  And while Mr. Hendricks agreed that identity theft was not a problem at the time of the FTC order and the Agreement of Assurances, he also testified that defendant faces the same general problems with reinvestigating mixed files and identity theft because in both instances the reporting banks are confused about identity.  Mr. Hendricks concluded his direct examination by saying the following:

> Everything in my experience, including other cases I've worked and the history I've talked about and what we see here, leads me to the inescapable opinion that Equifax is very satisfied with the way its system works. It's made a calculation that it's the right thing for it to do. And it has no intention of making the changes that I think are necessary to avoid the kind of problems that happened to Mr. Drew.

TR 624:14–624:20.

Defendant objects to the admissibility of the FTC and state Agreement of Assurances documents, and to Mr. Hendricks's testimony regarding them.  Defendant argues that the documents are irrelevant, since they relate to mixed files and not identify theft, and because they predate any serious problems with identity theft.  As discussed above, however, Mr. Hendricks's testimony explained why mixed files and identity theft present problems that are similarly difficult to resolve for a credit reporting agency.  *See* TR 621:5–621:15.  This shows that the documents are, in fact, relevant to the question of foreseeability and

---

[2]    Defendant argues in its reply that it presented evidence demonstrating that its investigative procedures go beyond the mere "parroting" described by Mr. Hendricks. Defendant's evidence regarding what other procedures it may utilize to combat identity theft does not compel the Court to conclude that the jury's verdict is wrong.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    thus the question of willfulness.[3]

2        Even if the agreements themselves (and Mr. Hendricks's testimony regarding them) were not

3    admissible, the logic of Mr. Hendricks's conclusion would be supported by his expertise and the record.

4    A reasonable jury could determine that a credit reporting agency runs an unjustifiable risk of violating

5    FCRA's reinvestigation requirement when it asks a bank to reconfirm the existence of a challenged

6    account simply by asking the bank to reconfirm the account, without even indicating that the consumer

7    has reported that his identity was stolen.  Such a conclusion would be particularly reasonable in this

8    case, where fraud alerts were placed on the account and other credit cards had been deleted.[4]

9        Defendant is not entitled to JMOL on the question of willfulness.

10

11    **II.    Challenges to damages**

12        **A.    Due process and punitive damages amount**

13        Defendant argues that even if it is not entitled to JMOL on the questions of liability or

14    willfulness, the actual amount of punitive damages in this case is so excessive as to violate defendant's

15    right to due process.

16        "The Constitution imposes certain limits, in respect both to procedures for awarding punitive

17    damages and to amounts forbidden as 'grossly excessive.'"  *Philip Morris USA v. Williams*, 549 U.S.

18    346, 353 (2007).  No "simple mathematical formula" exists in this area.  *BMW of N. Am., Inc. v. Gore*,

19    517 U.S. 559, 582 (1996).  Nevertheless, the Supreme Court has pointed to three guideposts: "(1) the

20    degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or

21

22        [3]    In its reply brief, defendant argues that the documents are inadmissible under Federal
Rule of Evidence 408.  Defendant did not raise this objection in its motion in limine, in its oral objection
23    at trial, or in its opening brief, and the Court considers it waived.  *See* Doc. 395 at 12–13; TR
618:1–620:5.
24

25        [4]    Defendant also argues that evidence regarding its handling of the other three cards should
not have been admitted, and had it not been admitted, no reasonable jury would have found its handling
26    of the Bank of America card to be a willful FCRA violation.  The Court disagrees.  Assuming that
defendant objected to the mention of the three cards at trial, and assuming that the any discussion of the
27    cards was improper, defendant still was not prejudiced.  Defendant relied on its arguably proper
handling problems with the three cards as evidence that its complaint system and reinvestigation process
28    are reasonable and effective.  *E.g.* TR 1334:21–1335:2 ("It worked exactly the way it's supposed to
work.").

9

United States District Court
For the Northern District of California

1   potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between

2   the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable

3   cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). "In considering them,"

4   the Ninth Circuit has explained, a court's "goal is to determine whether the punitive damages achieved

5   their ultimate objectives of deterrence and punishment, without being unreasonable or disproportionate."

6   *Southern Union Co. v. Irvin*, 563 F.3d 788, 791 (9th Cir. 2009).

7       Defendant argues that its conduct was not reprehensible, because it did not threaten or cause

8   physical harm to plaintiff or others, or otherwise act with intentional malice, trickery, or deceit.  It

9   argues that the punitive damages are excessive in light of the compensatory damages, because the

10  compensatory damages provided plaintiff with complete compensation, especially considering the brief

11  period of time of any FCRA violation.  Finally, it argues that the award far exceeds civil penalties that

12  would be available if the Federal Trade Commissioner brought suit against defendant for engaging in

13  unfair or deceptive practices under the Federal Trade Commission Act.

14

15          **1.    Reprehensibility**

16      Courts are "to determine the reprehensibility of a defendant by considering whether:

17      the harm caused was physical as opposed to economic; the tortious conduct evinced an
        indifference to or a reckless disregard of the health or safety of others; the target of the
18      conduct had financial vulnerability; the conduct involved repeated actions or was an
        isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or
19      mere accident.

20  *Campbell,* 538 U.S. at 419.  "[R]epeated misconduct is more reprehensible than an individual instance

21  of malfeasance."  *Gore*, 517 U.S. at 577.

22      Mr. Hendricks testified that defendant's violation of FCRA was the result of a policy chosen

23  after a careful cost benefit analysis, with full knowledge of the risks to those seeking credit.  TR

24  624:14–624:20.[5]  Plaintiff and Drs. Spiegel and Gore-Felton all testified that plaintiff suffered serious

25

26          [5]      Defendant argues that it is being punished for earlier, dissimilar acts that were the subject
        of the FTC order and the Agreement of Assurances about which Mr. Hendricks testified.  Any danger
27      that defendant was punished for the actions that were subject to the FTC order and the Agreement of
        Assurances is outweighed by the relevance of the documents and Mr. Hendricks's testimony to the
28      question of foreseeability and thus willfulness, which are properly considered by a jury when calculating

United States District Court
For the Northern District of California

psychological harm from the credit reporting issues.   TR 375:22–377:17; TR 392:22; TR 427:17–427:25; TR 454:8–454:12; TR 233:18–235:10.  Although "targeted" might be too strong a word to use, plaintiff does fall squarely within the class of individual consumers that defendant knowingly puts at risk with its reinvestigation policies.

The evidence strongly supports a finding that the harm plaintiff suffered was not the result of mere accident.  Plaintiff testified that, while he was away from home being treated for near fatal cancer, he singlehandedly caught the individual who had stolen his identity even though the police and hospital personnel had not believed him or wanted to help him.  TR 180:7–180:10; 182:14–193:1; 195:19–197:8; 201:15–202:8; 203:16–203:22; 917:19–919:5.  When he was told to go to hospice for the second time, he instead found a hospital to provide him with an experimental treatment that saved his life.  TR 204:16–204:19; 214:21–217:2.  When he finally recovered from his cancer and discovered that the state prosecution of the identity thief had not proceeded, he convinced the federal authorities to commence an unprecedented criminal HIPAA prosecution.  TR 222:6–223:14.  But he couldn't navigate the system that defendant had set up to correct his credit report.[6]

### 2.   Actual or potential harm suffered versus punitive damages

The second guidepost as to whether a punitive damages award violates a defendant's due process rights is whether the award is disproportionate to the actual or potential harm suffered by the plaintiff. One way that courts address this question is by comparing punitive and compensatory damage awards. Although the Supreme Court has hesitated to lay down any bright line rules, it has hinted that a single-digit ratio between punitive and compensatory damages is most likely to satisfy due process.  *See Campbell*, 538 U.S. at 424–25.

---

punitive damages.

[6]       Additionally, as the Third Circuit has explained, there is "nothing wrong with a jury focusing on a defendant's seeming insensitivity in deciding how much to award as punitive damages." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 718 n. 37 (3d Cir. 2010) (internal quotation marks omitted). Defendant argued to the jury that its system generally "worked perfectly."  TR 1335:8–1335:9.  It blamed Bank of America for providing them with incorrect information. *E.g.* TR 1341:24–1342:3. It also blamed plaintiff for failing to communicate the exact details of the problems. *E.g.* TR 1338:8–1338:17.  This last defense was perhaps the most difficult for a jury to accept.

Defendant argues that the compensatory damages compensated plaintiff completely, and therefore that the punitive damages award should have been at or near the amount of compensatory damages, rather slightly more than double the amount.  Defendant's argument takes a quote from *Campbell* out of context.  After considering *all* of the guideposts, not merely this second guidepost, the *Campbell* Court concluded that the facts of the case "likely would justify a punitive damages award at or near the amount of compensatory damages."  *Id.* at 429.  Moreover, the phrase "at or near" was intended to contrast with the overturned punitive damages award, which was 145 times higher than the compensatory damages award.  *See id.* at 426.  In this case, the ratio of punitive damages to compensatory damages is close to 2:1, which falls well within the case's single-digit rule of thumb. Although the *Campbell* Court noted that the compensatory damages in that case had compensated plaintiff in full, there is no reason to think that *Campbell* stands for the proposition that anytime a compensatory damages award fully compensates a plaintiff then the punitive damages cannot exceed the compensatory damages.

### 3.     Difference between punitive damages and available civil remedies

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness."  *Gore*, 517 U.S. at 583.  Defendant argues that the Federal Trade Commissioner can obtain $10,000 per FCRA violation by suing under the Federal Trade Commission Act, and that the punitive damages award in this case is clearly excessive in light of that small number.

Plaintiff points to Third, Fourth, and Sixth Circuit opinions that have all held that this factor is not particularly useful to the due process analysis in a FCRA case.  *See Cortez*, 617 F.3d at 724 (explaining that "there is no 'truly comparable' civil penalty to a FCRA punitive damages award"); *Saunders v. Branch Banking & Tr. Co. of VA*, 526 F.3d 142, 152 (4th Cir. 2008) (concluding that Congress specifically chose not to limit punitive damages); *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 154 n.1 (6th Cir. 2007) (noting that FCRA does not limit compensatory damage awards in suits brought by private citizens).  The Ninth Circuit has not considered the question.

The Court agrees with plaintiff and the appellate courts.  As the Fourth Circuit explained,

"Although FCRA does place limits on civil penalties when suit is brought by the government, Congress specifically chose not to limit punitive damages in suits brought by private parties. *Saunders*, 526 F.3d at 152 (internal citations omitted).

The $700,000 punitive damages award in this case does not violate defendant's due process rights.

## B.   Remittance of damages awards

Defendant also argues that the compensatory and punitive damages awards are excessive and should be remitted to $200,000 and $50,000 respectively.[7]

### 1.   Remittance of compensatory damages
#### a.   Non-economic damages

Defendant argues that the weight of the evidence does not support a large award of emotional distress damages because defendant's role in any of plaintiff's suffering was minimal and there was only a short amount of time during which defendant could be found to have been neglectful.  In support of its argument, defendant cites *Sloane v. Equifax Info. Servs. LLC*, 510 F.3d 495 (4th Cir. 2007).

The defendant in *Sloane*, who is notably the defendant in this case as well, was chastised for taking a remittitur number "out of the air."  *Id.* at 503.  The *Sloane* court explained that "Not only is such an unprincipled approach intrinsically unsound, but it also directly contravenes the Seventh Amendment, which precludes an appellate court from replacing an award of compensatory damages with one of the court's own choosing." *Id.*  Ultimately, in reliance on Fourth Circuit precedent that does not appear to have a corollary line of cases in the Ninth Circuit, the court remitted the emotional distress award slightly.  *Id.* 506–07; *see also id.* (explaining that the Fourth Circuit reviews emotional distress awards by looking at a variety of very specific factors).

_____

[7]   In the heading of its argument regarding compensatory damages, defendant states  that a new trial should be granted.  Defendant states that a new punitive damages trial should be granted as well.  But the defendant's substantive arguments all focus on remittitur.  To the extent that defendant does, in fact, seek a new trial on damages and not merely a new trial nisi remittitur, the Court denies defendant's request for the same reasons that it denies remittitur.

United States District Court<br>For the Northern District of California

Here, defendant leaves the Court to speculate where its $200,000 figure comes from. It does not explain why $315,000 is shocking to the conscience or unsupported by the evidence while $200,000 is a proper number.

More importantly, plaintiff has presented significant evidence of emotional distress that he suffered as the result of his unique circumstances. Plaintiff testified regarding his own anxiety, fear, sleeplessness, nightmares, and depression. TR 233:18–235:10. Dr. Spiegel, a specialist in psychological treatment of cancer patients at Stanford, testified that plaintiff was diagnosed with an adjustment disorder with anxious mood, and he confirmed a causal connection to defendant's FCRA violation. TR 375:22–377:17; TR 392:22; TR 427:17–427:25. Dr. Gore-Felton also related the psychological circumstances to the credit reporting problems. TR 454:8–454:12. Of particular relevance to the questions of causation and of the severity of the emotional distress damages is the following testimony from Dr. Spiegel:

> Well, what happened in his case, and happens in many cases, is that if a . . . problem you think was resolved is not, and it comes up again, or you face another threat, it does a couple of things. It triggers all of your network of memories and associations, as it did with Eric, to what happened the first time.
> So it's like . . . somebody who comes back from combat and has post-traumatic stress disorder, and then gets in a minor car accident, just a little fender-bender, and all the memories and feelings of the combat trauma start to come back.
> So in his case, the second frustration started to trigger his memories of what happened when his identity was fi[r]st stolen and what he had to do about it.
> Secondly, the essence of stress like this is helplessness, that you don't feel you can do anything about it. Something is happening to your identity or your credit or something else, and there's nothing you can do about it. Things aren't going the way you want them to.
> So he then did something rather out of the ordinary to do something about it. And that, I think, for a while made him feel more in control of his life and his future. And then you find out that it didn't work, that there's more trouble, you hadn't resolved it. So it tends to make you feel helpless. And that's when Eric thought he got it figured out, he did something unusual, and then he finds out that it didn't work.
> So it adds to the sense of helplessness, which makes you anxious, instead of feeling that you have mastered the stressor. And that's what happened to him.

TR 386:3–387:6.

The non-economic portion of the compensatory damages award is supported by the evidence and is not grossly excessive, monstrous, or shocking to the conscience.

United States District Court
For the Northern District of California

### b.   Economic damages

Defendant also argues that the economic damages award is unsupported because of a problem with plaintiff's evidence. Defendant argues that plaintiff should not have been permitted to introduce medical bills and expenses from Dr. Saito-Perry, since Dr. Saito-Perry did not testify at trial and evidence of his treatment was hearsay. Without this evidence, defendant argues, plaintiff could not have proven that he was entitled to nearly $6,000 in economic damages.

Defendant states that the bills themselves were admitted into evidence and should not have been. Plaintiff states that they were stipulated to, and that in any event plaintiff authenticated the bills and testified as to the relationship between the bills and the FCRA violations.[8] On this record, the Court does not find that the economic damages award were "clearly unsupported by the evidence." *Brady*, 859 F.2d at 1557.

### 2.   Remittance of punitive damages

Defendant argues that the punitive damages award should be reduced to $50,000. As with defendant's JMOL and due process arguments regarding the punitive damages award, defendant's remittance argument is based on the premise that the evidence, at most, shows a careless oversight for a single account during a short time period. For the reasons explained above, the Court disagrees with defendant's characterization of the evidence and finds that the punitive damages award is supported by the evidence and is not grossly excessive, monstrous, or shocking to the conscience.

Defendant is not entitled to remittance of any of the damages awards.

### III.   Motion for a new trial

Defendant argues in the alternative that it is entitled to a new trial because the first trial was manifestly unfair for several reasons. The Court addresses each contention in turn.

---

[8]   With respect to this claim, neither side cites to the record to demonstrate what evidence was admitted, where, how, over whose objection, and why.

**A.      Unsupported claims**

Defendant argues that it was prejudiced by the Court's failure to grant JMOL with respect to claims related to the First USA, Chase, and Citibank cards, and claims made under subsections 1681i(a)(5)(B), 1681i(a)(5)(c), and 1681i(a)(6) of FCRA.

**1.      The three cards**

Defendant has pointed to no place where plaintiff argued to the jury that liability should be premised on actions relating to the First USA, Chase, and Citibank cards.  In fact, plaintiff made clear in his opening statement that his claims related to the Bank of America card, *e.g.* TR 123:8–123:21, and plaintiff's case focused on his attempts to get defendant to reinvestigate the Bank of America report.  To the extent that the other cards were mentioned during the course of the case, defendant clarified in its closing statement that they did not form the basis of plaintiff's liability argument.  *See, e.g,* TR 1331:23–1331:24 (Bank One); TR 1335:5–1335:8 (Citibank); TR 1339:6 (Chase).  Defendant was not prejudiced by the alleged presence of these claims in this case after defendant's JMOL motion was filed.

**2.      The three subsections**

Subsection 1681i(a)(5)(B) states a variety of requirements relating to the reinsertion of previously deleted material.  Subsection 1681i(a)(5)(c) requires a credit reporting agency to maintain reasonable procedures designed to prevent the reappearance of deleted information in a consumer's file.  Subsection 1681i(a)(6) requires a credit reporting agency to provide notice of the results of its reinvestigation, and includes content and timing requirements.

Defendant argues that plaintiff presented no evidence that defendant violated any of these subsections, and that it was prejudiced because the jury was permitted to consider them even after defendant filed a JMOL motion.  Plaintiff argues that defendant reinserted a previously deleted address without proper certification and then failed to notify plaintiff within five business days, as required by 15 U.S.C. § 1681i(a)(5)(B)(ii).  Plaintiff argues that defendant's notice of the results of its reinvestigation contained false information, in violation of 15 U.S.C. § 1681i(a)(6).

Plaintiff cites to evidence that defendant deleted and then reinserted derogatory information

regarding the Bank of America card and a notation that the Bank of America card was an open account, and that it deleted and reinserted the false Seattle address, without proper notice or certification. Defendant does not reply to plaintiff's argument to show how this is not sufficient evidence of a violation of 15 U.S.C. § 1681i(a)(5)(B)(ii) (and thus circumstantial evidence of a violation of subsection 1681i(a)(5)(C)'s requirement that defendant maintain reasonable procedures). Plaintiff cites to evidence that defendant misrepresented that it had deleted the fake address when in fact it had made the fake address into a former address, and that later it again misrepresented that it had deleted the fake address when it had not. Defendant does not reply to plaintiff's argument to show how this is not sufficient evidence of a violation of subsection 1681i(a)(6)'s notice requirement.

In any event, even if these theories of liability were not properly before the jury after defendant filed its JMOL motion, defendant was not prejudiced. Had the motion been granted, it would have been too late to impact the presentation of evidence in the case, and plaintiff did not focus on these subsections during closing argument. These were not independent, stand alone claims, but rather theories of liability. And the jury was instructed as to six other theories of liability, some of which were supported by fairly strong evidence of violation.

### B.    Chico properties

Defendant argues that the Court should have instructed the jury not to award any emotional distress damages in connections with plaintiff's attempt to buy investment properties in Chico.

At the close of evidence, the Court determined that plaintiff had not presented sufficient evidence that he suffered economic damages in relation to the Chico properties. Therefore, the Court instructed the jury that "Plaintiff is not making a claim for, and you should not award, monetary-loss damages related to the Chico real estate properties." TR 1283:19–1283:21. Defendant acknowledges that the Court instructed the jury not to award economic damages in relation to the Chico properties, but argues that the Court did not go far enough. Defendant argues that the Court should have instructed the

United States District Court
For the Northern District of California

17

jury that it could not award non-economic damages either.[9]  Defendant believes that it cannot be liable for emotional damages stemming from any denial of credit if it was not responsible for any denial of credit.

Although economic damages can only be substantiated by evidence of actual economic harm, such as a denial of credit, non-economic damages need only be substantiated by evidence of emotional distress suffered because of a violation of FCRA.  No actual denial of credit is necessary.  In this case, plaintiff testified about his anger and frustration at having to deal with continuing errors on his credit report when attempting to invest in real estate in Chico, which plaintiff said impacted his relationship with his then-fiancée, now former wife.  TR 254:21–259:23.  To the extent that any portion of the jury award was based on non-economic damages related to the Chico properties, plaintiff's testimony that he was angry and frustrated and that his romantic relationship was suffering because of his credit problems is sufficient to support the award, even if he never applied for a loan.[10]

### C.    FTC Consent Decree and Agreement of Assurances

Defendant again argues that Mr. Hendricks should not have been permitted to testify about the FTC consent decree or the Agreement of Assurances, because they did not support plaintiff's claim in any way.  Defendant argues that it was prejudiced even at the liability stage by the introduction of this evidence and testimony.  The Court addressed this argument above in the context of defendant's punitive damages argument, and it rejects defendant's liability argument for the same reasons.

---

[9]    Defendant did make this argument at trial, TR 1049:1, though defendant did not object to the final instruction or ask that it be augmented, and in fact defendant highlighted it in its closing argument.  TR 1345:7–1345:9 ("And as the Judge told you, and as Mr. Keating told you, Mr. Drew is not seeking any money related to those Chico properties or any aspect of those mortgages.").

[10]    Defendant also argues that the only evidence that could possibly support an award are tri-merge documents, which are hearsay and cannot be used to prove the contents of plaintiff's Equifax file.  But other evidence—such as plaintiff's testimony—shows that plaintiff's Equifax file contained erroneous information both before and after plaintiff considered investing in the Chico properties.  The jury was free to deduce from that evidence and from plaintiff's testimony that his emotional distress damages were caused by defendant's FCRA violation.

United States District Court
For the Northern District of California

**D.      Trans Union and Experian**

In the introduction to its request for a new trial, defendant argues that the Court admitted evidence relating to Trans Union and Experian in order to prove defendant's liability in this case, contrary to the Court's own ruling on defendant's motion in limine.  Defendant does not identify any such evidence.  In the body of the motion, defendant argues generally that plaintiff testified regarding the results of the reinvestigations undertaken by Trans Union and Experian, although it does not identify any specific testimony.  Defendant does not claim that it objected to the evidence or testimony; rather, it states simply that the jury should not have been allowed to use the results of Trans Union and Experian's reinvestigations as a yardstick for the reasonableness of defendant's reinvestigation.[11]

The Court notes that defendant tried to deflect responsibility for plaintiff's emotional distress onto the banks and other credit reporting agencies.  TR 428:25–429:9.  In any event, to the extent that plaintiff testified that the other credit reporting agencies had resolved his complaints properly and timely, plaintiff's testimony was relevant to the question of damages.

**E.      Doctor Christopher Saito-Perry**

Defendant argues that it was prejudiced by plaintiff's introduction of medical bills and expenses from Dr. Saito-Perry.  As explained above, the Court does not find that defendant was prejudiced by this evidence.

**F.      Section 1681c-2 claim**

Finally, defendant argues that the Court permitted plaintiff to amend his complaint mid-trial to state a claim under Section 1681c-2 of FCRA, and that this was improper.  Defendant argues that the sole claim remaining in the case at the beginning of the trial was brought under Section 1681i (which relates to reinvestigation generally), and that plaintiff should not have been permitted to make a claim under Section 1681c-2 (which relates to identity theft in particular).

Section 1681c-2(a) requires credit reporting agencies to "block the reporting of any information

---

[11]      As to this point, defendants provided no citations to the record.

19

in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of" certain documents from the consumer. By way of comparison, Section 1681i requires credit reporting agencies to take certain actions within 30 days of the receipt of a consumer dispute, and pertains to disputes that do not expressly arise from identity theft. Thus, a consumer dispute will trigger duties under either Section 1681c-2(a) or Section 1681i, depending on whether it includes notice of identity theft.

The Court has already issued a written order explaining that the operative version of the complaint *already* encompassed a claim under Section 1681c-2. Doc. 436. Plaintiff alleged in the complaint that he gave notice to defendant that certain information in his credit file was the result of identity theft and that defendant "failed to block" the fraudulent information. Am. Comp. ¶¶ 202-06. This is sufficient to state a claim under Section 1681c-2(a) even though plaintiff did not specifically name that section in the complaint. Thus, contrary to defendant's argument at this juncture, the Court did not permit plaintiff to amend his complaint midtrial.

Even if the Court technically did permit plaintiff to amend his complaint midtrial, such amendment was proper and non-prejudicial. Federal Rule of Civil Procedure 15(b)(1) provides that:

> [i]f, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

The Court has discovered practically no case law discussing Rule 15(b)(1) specifically.[12] In one case discussing Rule 15(a), which concerns amendments before trial, the Fourth Circuit explained that amendment shortly before trial would be improper if "[t]he proof required to defend against this new claim would be of an entirely different character than the proof which the defendant had been led to believe would be necessary" or if the "[b]elated claims . . . change the character of [the] litigation."

---

[12] Rule 15(b)(1) is the appropriate subsection to apply given the unique facts of this case. At trial on July 22, 2010, plaintiff attempted to introduce certain evidence in support of a claim under 15 U.S.C. § 1681c-2(a). Equifax objected on the ground that this trial solely concerns a claim under 15 U.S.C. § 1681i. Plaintiff then moved to amend his complaint to add a claim under § 1681c-2(a) in order to conform his proof to the proof at trial, or alternatively to clarify that his existing complaint already includes a claim under § 1681c-2(a).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   *Deasy v. Hill*, 833 F.2d 38, 42 (4th Cir. 1987). In an unpublished opinion, the Fourth Circuit applied

2   this reasoning to a 15(b)(1) ruling. *See Dank v. Shinseki*, 374 Fed.Appx. 396, * 4 (4th Cir. 2010). The

3   Ninth Circuit held, in a slightly different context, that even a post-trial amendment is non-prejudicial

4   where the objecting party "clearly understood that the issue . . . was before the court." *Galindo v.*

5   *Stoody Co.*, 793 F.2d 1502, 1513 (9th Cir. 1986). And, in another slightly different context, the Ninth

6   Circuit explained that granting a request for a continuance has the potential to cure any prejudice from

7   what it called a "surprise pleading amendment." *See Consolidated Data Terminals v. Applied Digital*

8   *Data Systems, Inc.,* 708 F.2d 385, 396 (9th Cir. 1983). Similarly, the Second Circuit has explained,

9   while discussing Rule 15's provisions about post-trial amendment, that "[g]enerally, introducing new

10  claims for liability on the last day of trial will prejudice the defendant." *Gussack Realty Co. v. Xerox*

11  *Corp.*, 224 F.3d 85, 94 (2d Cir. 2000).

12          Defendant argues generally that it was prejudiced because it was not on notice of this claim, did

13  not have the opportunity to conduct discovery on the claim, and did not have the opportunity to prepare

14  its witnesses to defend against the claim. As the Court's previous order has explained, defendant was

15  long on notice of the factual basis of plaintiff's claims. Defendant is familiar with the different

16  requirements of FCRA. Moreover, the evidence developed and presented at trial with respect to the

17  Section 1681c-2 claim was largely the same as that presented for the Section 1681i claim. Liability

18  under each statute arises from the same dispute, with the only factual question as to which statute is

19  triggered being whether the dispute resulted from an alleged identity theft. The issue arose on the fourth

20  day of a nine day trial, and just before a three day break. Defendant did not request a continuance or

21  ask for permission to call any new witnesses. The Court finds that defendant was not prejudiced by any

22  midtrial amendment that may have occurred.

23          Defendant also argues that FCRA's two year statute of limitations prevented plaintiff from

24  asserting a Section 1681c-2 claim in 2010. Defendant's argument rests of the assumption that plaintiff

25  was amending him complaint in 2010 rather than asserting the claim in his original complaint. Even

26  if defendant's view of what happened is correct, the amendment does not violate the statute of

27  limitations. The Section 1681c-2 claim undeniably arises from the same "conduct, transaction, or

28  occurrence set out . . . in the original pleading," and therefore any amendment adding a Section 1681c-2

claim relates back to the date of the original pleading.  *See* Fed. R. Civ. P. 15(c)(1)(B).  Defendant identifies the alleged violation as occurring in the fall of 2005.  This suit was filed in December 2006. There is no statute of limitations problem.[13]

Defendant is not entitled to a new trial.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendant's renewed motion for JMOL and alternative motion for a new trial.  (Doc. 464.)

**IT IS SO ORDERED.**

Dated: December 3, 2010

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

---

[13]     Defendant argues in the introduction to the section of its motion arguing for a new trial that it was prejudiced by the admission of certain other unspecified evidence over its objections.  The defendant does not develop or even mention this argument in the body of the motion, and the Court considers it waived.